IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,
     Plaintiff

    v.             CIVIL ACTION NO. 04-4 ERIE

CITY OF ERIE, PENNSYLVANIA,
     Defendant


STATUS CONFERENCE



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C & Judge's Chambers, U.S.

Courthouse, Erie, Pennsylvania, on

Friday, January 6, 2006.




APPEARANCES:
     SHARON SEELEY, Esquire; and CLARE GELLER,
     Esquire; U.S. Department of Justice, Civil
     Rights Division, appearing on behalf of
     the Plaintiff.

GERALD J. VILLELLA, Esquire, Assistant City
Solicitor, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1           P R O C E E D I N G S

2

3           (Whereupon, the proceedings began at 1:30 p.m., on

4   Friday, January 6, 2006, in Courtroom C.)

5

6           THE COURT:  This is the time that I set for a status

7   conference to determine where we're going with this case.  And

8   I guess for starters, it would be helpful for me to hear from

9   the government exactly what your theory of damages are in this

10  case and precisely the type of relief that you're looking for,

11  and who the plaintiffs are that you're seeking damages or some

12  type of relief on behalf of.  So whoever wants to address that,

13  would you come on up to the podium.

14          MS. SEELEY:  Sure, your Honor.  This is Sharon

15   Seeley for the United States.  And in terms of the kind of

16   relief that the United States is seeking, there are essentially

17   three primary forms of relief that we can get under Title VII,

18   we're seeking each of those.  The first is to essentially

19   eradicate the practice that's been found unlawful.

20          THE COURT:  It's already happened, it's been gone

21   for three years.

22          MS. SEELEY:  Yes, your Honor.

23          THE COURT:  In other words, I can't see how -- it

24   would seem to me by virtue of the fact that the system that was

25   in place that was challenged was abandoned three or three and a

                                3

1   half years ago, it moots the possibility of any viable

2   injunctive relief?

3          MS. SEELEY:  Well, your Honor, our position is that,

4   and the case law supports this, is it doesn't moot the issue.

5   There is case law that says just because an employer has

6   voluntarily ceased the unlawful practice, doesn't moot it, it

7   doesn't mean the court doesn't have the authority, shouldn't

8   grant the injunctive relief.  One form of injunctive relief

9   that we normally seek is simply an order telling the employer

10  not to use that practice anymore.  But we also normally seek

11  injunctive relief in the form of an order that the employer not

12  use, in this case, for instance, another physical agility test

13  without having it approved by the United States or the court.

14  So that, for instance, they don't develop another test that has

15  the same or similar problems as the physical agility test that

16  was at issue in this case.  So there is still some injunctive

17  relief we believe that would be appropriate.

18          THE COURT:  In other words, the City could not

19  switch or modify its test, this would be one of the

20  government's theories of relief, without seeking approval from

21  the court?

22          MS. SEELEY:  Or from the United States.  If neither

23  party disagreed that it would probably be fine.

24          THE COURT:  That's one type of relief, what else are

25  you looking for?


                                4


1           MS. SEELEY:  The other two kinds of relief are

2  essentially to make the individuals that were harmed by the

3  unlawful practice in the past whole.  And that breaks down into

4  two kinds of relief.  One is monetary relief.  And what's

5  available under Title VII is essentially back pay, which

6  includes the value of benefits and prejudgment interest.

7  That's essentially monetary relief.  There are no compensatory

8  damages.

9       THE COURT:  Who is the class?

10      MS. SEELEY:  The class in this case would consist of

11  the women who took the physical agility test that was unlawful

12  in '96, in 2002, which is the last time the City gave it and

13  failed the test.  Because they were screened out of the process

14  by that test.

15      THE COURT:  Do you know approximately how many women

16  we're talking about?

17      MS. SEELEY:  Approximately 110.  And I know that

18  because in the liability phase the City had agreed to the

19  number of women who took the test and failed the test.

20      THE COURT:  Any other relief that you're seeking?

21      MS. SEELEY:  The other kind of relief that we're

22  seeking to make victims whole is hiring relief or what we

23  sometimes call priority hiring relief.  Which is essentially

24  making job offers and hiring members of the class that are

25  currently interested in and qualified for the police officer

5

1  position.  Now, there are a 110 potential class members and

2  clearly the number of jobs that females would have gotten, even

3  absent the physical agility test, is much lower than that.

4        THE COURT:  Do you know the City of Erie has laid

5  off police officers in the last several months or weeks as a

6  result of a dire financial crisis here?

7        MS. SEELEY:  Actually, I was not aware of that, your

8  Honor.  But one of the things -- we normally ask that the

9  court, for instance, order the City within a certain timeframe

10  to make these priority hires, rather, we would ask that the

11  court order that the next hires or some portion of the next

12  hires that the City does make go to class members.

13        THE COURT:  Now, is that essentially it then?

14        MS. SEELEY:  Those are the three, your Honor.

15        THE COURT:  Fair enough, you can sit down.

16        MS. SEELEY:  Thank you, your Honor.

17        THE COURT:  Well, Mr. Villella, why don't you come

18  up to the podium and I would be happy to hear your thoughts on

19  the remedy situation as described by the United States?

20      MR. VILLELLA:  The remedies, that's always been a

21  pretty big conceptual hurdle for us when they first brought the

22  case and proposed to us a settlement along those lines.  The

23  calculation of the potential pool of persons who are damaged by

24  the test, we think the methodology they use is drawn from

25  situations in which there was maybe a single qualification that

6

1  was disparate and there was only some technical or minor

2  qualifications afterward to be hired.  Here for '96, '98, the

3  2000, the physical agility test was the initial qualifier, you

4  still had to have a passing rank order on the written test, as

5  well as the psychological examination --

6      THE COURT:  You said '96, '98 and 2000 -- was

7  passing the physical agility test the threshold to get on to

8  some other tests?

9      MR. VILLELLA:  Yes.

10      THE COURT:  This is for '96, '98, 2000, in addition

11  then to the physical agility test, what other tests, if you

12  will, or requirements did a candidate have to meet in order to

13  successfully be hired as a police officer?

14       MR. VILLELLA:  A written Civil Service test subject

15  to rank order hiring, which was also subject to a mandatory

16  state veteran's preference.

17       THE COURT:  Was it set up in such -- were there

18  cutoff scores for the written Civil Service, you had to reach a

19  certain score to be considered?

20       MR. VILLELLA:  A passing score and those who passed

21  were then in rank order.  After the veteran's preference were

22  given to those who qualified for it.

23       THE COURT:  In addition to your veteran's

24  preference, were there any other factors that influenced the

25  ranking?

7

1       MR. VILLELLA:  I'm pretty sure no, I know that they

2  tried to implement some more factors most recently in the past

3  couple years to partially address diversity.

4       THE COURT:  I'm talking about then, '96, '98 and

5  2000.  And then ultimately the hiring would take place based

6  upon the perceived need on the part of the City, is that right?

7       MR. VILLELLA:  Right.  Well, an offer for hire would

8  be made, then a psychological exam and background check would

9  be done for persons who were ranked at that point to be hired.

10       THE COURT:  So those were two other factors that had

11  to be cleared in order to be successfully hired?

12       MR. VILLELLA:  Right.

13       THE COURT:  What about for '97, '99, 2001 and 2002?

14       MR. VILLELLA:  Those lists, they were biannual

15  lists, those would just be created every two years.

16       THE COURT:  So what was happening here was the way

17  it was going all the way through?

18       MR. VILLELLA:  Right.

19       THE COURT:  That having been said, explain to me

20  what you referred to as the City's conceptual difficulty?

21       MR. VILLELLA:  Well, the government was telling us

22  back in the beginning that they calculated somehow that they

23  thought 7 to 10 women who failed this test would have been

24  hired, either because they scored well enough or some means

25  that we couldn't discern very well.  And that they thought that

1   was the range at which we should be looking at settlement, to

2   create a pool of funds.  They also said they recognize the two

3   year statute of limitations for a payback limit or that within

4   two years people would either would have found another job or

5   the two years seemed to be the window that they were looking

6   at.

7          THE COURT:  Did any of the women -- I take it since

8   the test was administered first during these years, that none

9   of the women who passed -- excuse me, that none of the women

10   who failed the physical agility test would have taken the Civil

11   Service exam?

12          MR. VILLELLA:  Not in those three years, that's

13   right.  Only in 2002 in passing the test -- passing the written

14   test was the qualifier to get to the physical agility test.

15          THE COURT:  Only in 2002?

16          MR. VILLELLA:  Right.

17          THE COURT:  So they would take the Civil Service

18   test first in 2002, is that what you're telling me?

19          MR. VILLELLA:  Yes, that order was reversed, as was

20   the calisthenics and the obstacle course on the physical test.

21          THE COURT:  For '96, '97, '98, '99, 2000 and 2001,

22  the trip wire, if you will, was the physical agility test?

23          MR. VILLELLA:  Yes, that's right.

24          THE COURT:  All right.  Go ahead.

25          MR. VILLELLA:  Even on the eve of trial when we were

9

1  trying to see if it was possible to settle this case with a

2  more open-ended financial arrangement for damages, in that we

3  weren't sure if we had a single person that might end up being

4  qualified, failed the test, came back and showed they had

5  qualified under the newer rules or the more revised physical

6  test, as well as the written test.  As a matter of fact, I

7  cited to one of the senior attorneys over the phone with

8  Justice, that there was a woman who had failed in 2000 the

9  physical test, came back in 2002 and took the written test

10  first and failed it.  His response was, well, you can't prove

11  to me that she would have failed back in 2000, we can take that

12  into consideration.  At that point it seemed to evolve, didn't

13  seem like very much progress was made.

14          THE COURT:  Before we sit down and talk a little bit

15   and explore this damage issue a little bit more, in reading the

16   paper after the decision came down, I think you were quoted as

17   attempting to decide on behalf of the City whether an appeal

18   would be taken.  Now, how can you take an appeal from an

19   interlocutory decision?

20         MR. VILLELLA:  Well, you had bifurcated under Rule

21   42 and entered judgment on that.  Isn't that then appealable as

22   a right.  I believe, it seemed to be appealable, I'm still

23   looking at that to make sure or whether we have to wait for the

24   damages phase.

25         THE COURT:  Let me just say if you do have the right


                              10


1   to appeal -- obviously, it's not for me to say whether you do

2   or not, but I thought it was an important enough procedural

3   point that we don't want to get too far down the track without

4   knowing for sure.  In other words, we don't want to waste

5   anymore time, we want to keep this moving one way or the other.

6   All right, you can sit down.  Is this a final order -- I'm

7   asking the government?

8         MS. SEELEY:  Your Honor, it is not a final order.

9      THE COURT:  I'm sorry.

10     MS. SEELEY:  Our position is that it's not a final

11  order that would be immediately appealable.  There is case law,

12  including Supreme Court case law, saying that in a Title VII

13  case.  I can give it to Mr. Villella if he would like to look

14  at it.

15     THE COURT:  All right, that's an issue -- either

16  there will be an appeal or not.  If there is, it will either be

17  quashed or it won't.  But if it is as clear as you say, then

18  you can discuss it with Mr. Villella.

19     MS. SEELEY:  Sure.

20     THE COURT:  Now, getting back to this damage

21  question, this seems speculative, awfully speculative.

22     MS. SEELEY:  Your Honor --

23     THE COURT:  Because there are multiple hurdles.  How

24  do you go back in time and reconstruct this in any meaningful

25  way?


11


1      MS. SEELEY:  That is a problem that every court has

2  to deal with in these kinds of cases.  To be clear, when we say

3    there is a class of about 110 women and those are all the women

4    who failed the test during the relevant period, we're not

5    suggesting that that many jobs were lost or that all of those

6    women would get the full value of the job as a police officer.

7          THE COURT:  Whether all of those women would have

8    necessarily qualified under the other requirements, how do you

9    know that?

10         MS. SEELEY:  We don't know that, that's one of the

11   problems.  What the cases say is any uncertainty should be

12   decided against the City.  But the way that the courts deal

13   with this --

14         THE COURT:  With all respect, the cases you cited me

15   and this is why this is a horse of a slightly different color,

16   because in many cases where there is a trip wire, it is the

17   only trip wire?

18         MS. SEELEY:  We understand that, your Honor.

19         THE COURT:  So I would turn again, let's just

20   conceptually move this out.  Let's assume -- I presume there

21   would have to be some period of discovery.  One, what would you

22   be discovering, and then paint for me the picture, if you

23   would, as to how this case would ever be tried and what the

24   jury would be determining and/or me -- I think the jury, what

25  the jury would be determining?

12

1       MS. SEELEY:  It would be you, your Honor.

2       THE COURT:  It would be me.  Tell me what I would be

3  deciding?

4       MS. SEELEY:  Okay, I think the starting point to try

5  to make that clear is what the courts do in these cases is they

6  cap the relief.  Although, there are a 110 class members

7  potentially entitled to relief, the cap on both the hiring

8  relief and the monetary relief is set based on a shortfall

9  number, a hiring shortfall.  So, a 110 women failed the test,

10  but we know that even if all of them had passed, not all of a

11  110, in fact far fewer of that than would have been hired.

12       THE COURT:  Right.

13       MS. SEELEY:  So we have to calculate a shortfall.

14  That's one of the things the court would have to determine is

15  what is that shortfall.  The numbers that Mr. Villella was

16  talking about, 7 to 10, that was our estimate of the shortfall

17  prior to full discovery --

18       THE COURT:  What you do mean 7 to 10?

19          MS. SEELEY:  Seven to 10 positions that would have

20    been filled by women if women had passed the physical test at

21    the same rate as men.  So we take a look at how many women

22    failed this test who would have passed, had women passed at the

23    same rate.  Then we go on to the next step, we don't stop

24    there.  We say okay, well amongst people who did pass the test,

25    what was the probability that they would pass the next step.


                                    13


1    Then we apply that factor, which may only be 20 percent to the

2    110, which reduces it.  And then take another step, we say what

3    would be the probability they would have passed that step.  And

4    in the end we get down to 7 to 10.

5          THE COURT:  But the estimate, if you will, or

6    guesstimate of 7 to 10 positions that would have been filled by

7    women, obviously, those women would have successfully cleared

8    all the hurdles, upon what empirical proof is that based, other

9    than pure hunch?

10          MS. SEELEY:  Well, the number would probably be

11    based on expert testimony based on information that we still

12    have to get in a complete form from the City.  The hiring

13  information, how many people who passed the physical tests in

14  fact passed the other tests.  Then we would probably have a

15  statistician look at that and come up with a firmer number than

16  that 7 to 10.

17         THE COURT:  Is it your sense, if you have one, based

18  upon other cases that you have been involved in, as to whether

19  or not when a case reaches this stage, a case of this nature,

20  that it is possible or typical that there is a stipulation that

21  could be entered into on that issue?

22         MS. SEELEY:  It has happened in some cases, your

23  Honor.  In my experience what happens is that if the parties

24  are able to agree to that, the case settles at this point.

25  Because that is a very critical number in terms of how many


                                14


1   jobs offers we would seek for specific class members, as well

2   as monetary relief.  Because a cap on monetary relief is also

3   based on that value of, for instance, seven jobs.

4          THE COURT:  Here's another question.  Let's just

5   assume for the sake of discussion that there was some agreement

6   that was reached, whether it be six or seven or eight or

7    whatever, but there was an agreement.  How do you then decide

8    who the lucky winners are?

9        MS. SEELEY:  That would actually be part of,

10   assuming it doesn't settle, would be part of the process that

11   the court would have to go through and make determinations.

12       THE COURT:  Okay, throw it back to me, assuming that

13   you would reach an agreement, if you will, on this percentage,

14   how do I decide out of one hundred and some women who the seven

15   are that are going to be the beneficiaries of this back pay?

16       MS. SEELEY:  That is almost impossible to do in most

17   cases because we're trying to recreate the past.  So we don't

18   decide who the 7 to 10 are.  What the courts do is say that

19   given that these are all class members, the City then gets an

20   opportunity, if it wants, to attempt to prove that for some

21   reason they're really not class members, they're not entitled

22   to some relief.  But then whatever class is left, maybe it's

23   100 women, the court doesn't attempt to determine which seven

24   among the hundred would have gotten a job.  What it does is

25   split it up so each woman gets a portion of the value of the

15

1  job because the theory is, in essence, what each class member

2  lost was a possibility of a job.  So they may get 10 percent of

3  the value of one job because they have a 10 percent chance of

4  getting a job.

5        THE COURT:  Doesn't it remain incumbent upon them,

6  though, I suppose maybe a stipulation -- assume there is no

7  stipulation, isn't it your burden at trial before me to

8  demonstrate a percentage of successful applicants, what that

9  would be, through whatever means you feel would be appropriate,

10  be it expert testimony or otherwise?

11        MS. SEELEY:  And that probably would be expert

12  testimony exactly.  That's the same information that that

13  shortfall number would be based on.  Because that number is

14  what we get when we apply that probability or fraction to the

15  total of 110 women that failed.

16        THE COURT:  I can presume that if all 100 class

17  members were brought in here, that there would be -- there

18  would be a divergence of background and ability, everything you

19  would expect out of a group of 100 people.  If it went to

20  trial, wouldn't it be necessary for me to see and evaluate, if

21  you will, every individual, otherwise I'm just speculating?

22          MS. SEELEY:  That is in fact the preferred method in

23   the cases, your Honor.  And what the method that the United

24   States would request is that we have individualized hearings on

25   each of the women with the caveat that we would of course

16

1   obtain information about the women before we get to the point

2   of trial.  There may be some for whom we say, okay, we agree

3   they are not the ones who would have gotten the job, so it may

4   be whittled down somewhat.

5          THE COURT:  Let's presume that perhaps unbeknownst

6   some of these people have criminal records, that would be the

7   easiest objective disqualifier right there?

8          MS. SEELEY:  Sure.

9          THE COURT:  But whatever this smaller group that you

10  limit it down to, then, how would I know, how could I say now

11  in 2006 whether candidate Y sitting before me on the stand

12  would have achieved a sufficiently high score on the Civil

13  Service exam?

14          MS. SEELEY:  That is the difficulty, your Honor.

15  And that's why the courts usually give some pro rata share to

16   the class members.  They don't attempt to make that time

17   distinction as to who in fact would have passed through all the

18   other steps in the process because that is essentially, like I

19   said, trying to recreate the past.

20        THE COURT:  In a sense aren't I rewarding -- let me

21   put it this way.  If it is not necessary for me to make some

22   principal decision as to which of these individuals in fact

23   would have passed, and if I don't do that, then isn't there a

24   large class of individuals that are reaping a windfall to which

25   they never otherwise would have been entitled?


                                17


1        MS. SEELEY:  The case law recognizes that and there

2    are also some women among this class who are the women, if we

3    could recreate the past, would have gotten a job.  They're

4    getting less relief than they in a sense should get.  Because

5    if they had gotten it, they should be getting the full value of

6    a job.  And the courts say that's the best we can do.  If

7    that's the best we can do, we can't determine who the actual

8    winner would be, then the fairest thing is to know that some

9    are getting more and some are getting less than they're

10  actually entitled to.  But that's okay because each class

11  member -- I believe we cited some Supreme Court cases to your

12  Honor in our post-trial filings --

13       THE COURT:  But none of them are like this.  They're

14  very generic law.

15       MS. SEELEY:  Agreed, your Honor.  The one generic

16  point I want to make from that is that the class members are

17  presumptively each entitled to relief.  So the court is to

18  presume that.  If the City -- proves that one of them is not --

19  proves one them has a criminal record, for instance, that's

20  fine.

21       THE COURT:  Is one of the issues I'm going to have

22  to address, if this thing can't otherwise resolve itself, is

23  the whole issue of class certification?

24       MS. SEELEY:  This is not technically a class action,

25  the United States is the only plaintiff.  But we're authorized


18


1  to seek relief on behalf of these individuals.

2       THE COURT:  But doesn't it strike you, though, that

3  while, and perhaps these cases say what you say, I'm not saying

4  they don't, but rather than have a situation where some people

5  in the class, who otherwise clearly would not have made it,

6  receive some monetary benefit to the harm of those smaller

7  percentage of the class who clearly would have made it, doesn't

8  it strike you that as long as you're bringing in a 100 people,

9  that the more appropriate methodology for the court to engage

10  in is to determine precisely who would have made it and who

11  would have not and then only award damages to those who would

12  have made it; why are these other individuals entitled to a

13  dime if they wouldn't have made it?

14       MS. SEELEY:  If the court could do that, I would

15  agree.  It's usually impossible in these cases because we would

16  be trying to re-create what would have happened in 1996.

17       THE COURT:  But you're still doing that, it's still

18  happening.

19       MS. SEELEY:  It's much easier to do that when all we

20  need to determine is how many women would have been hired, 7 or

21  10, which individual would have passed the written test or some

22  other step.

23       THE COURT:  All right.  And then once that figure is

24  decided, then the question, my next question becomes, well the

25  back pay award I presume would be from the time they took the

19

1  test or otherwise would have finished the various tests that

2  would have got you hired, up to the date of the entry of the

3  award, correct, up to the present, is that the back pay?

4       MS. SEELEY:  Possibly.  Title VII allows back pay

5  less mitigation.  So to the extent that any of the class

6  members found a job that paid them at least as much, that's the

7  point at which this pay would stop.

8       THE COURT:  Or if any of the members found a job

9  that paid them more, they wouldn't get anything from day one --

10       MS. SEELEY:  Exactly.

11       THE COURT:  Then that's the back pay.  What about

12  front pay, what about future damages, how does that, that's the

13  wrong term, how does that work in a situation like this, if at

14  all?

15       MS. SEELEY:  Well, it can work in a situation like

16  this and it depends in part --

17       THE COURT:  Then you're really into the world of

18  pure speculation.

19       MS. SEELEY:  It depends on how -- what the court

20 orders in terms of hiring relief.  Because to the extent that

21 hiring relief is ordered fairly quickly, then we may not even

22 seek front pay or it may not be much of an issue.  If somebody

23 is going to be hired next, front pay doesn't really matter.  On

24 the other hand, in this case if it may be that because of its

25 budgetary problems, the City may not be able to hire victims

20

1 entitled to hiring relief --

2         THE COURT:  The City, I know no more than what you

3 read in the newspaper, but the City is teetering on the edge of

4 a financial disaster right now, that's the reality of it.

5         MS. SEELEY:  And certainly the United States accepts

6 that and we're not arguing with that.  And, if I may, your

7 Honor, that's one reason why -- what we would actually suggest,

8 in terms of how to proceed from here, is that the parties be

9 allowed a fairly brief period of time, something like 30 days,

10 to fully explore settlement possibilities.  Because we really,

11 the City's position prior to the liability trial was no

12 monetary relief and no priority hires.  Which that was fine

13 prior to the liability finding.  But they may have changed

file:///A|/ERIE1-6.TXT

14  their position because now we're presumptively entitled to some

15  monetary relief and some number of priority hires.  And we are

16  willing to negotiate that, we are willing to listen to the

17  City, as to what its problems may be, in terms of coming up

18  with an amount of monetary relief.  We haven't really had an

19  opportunity to negotiate any numbers.  The other thing that we

20  would recommend, if the court finds it appropriate in that

21  regard, is that the court refer us to the magistrate judge to

22  facilitate those kinds of discussions.  Following that, what we

23  would suggest is that the parties be given a deadline to file

24  briefs on the issue of injunctive relief, because that is

25  something I don't think we need to delay or wait for discovery

21

1  on.  The United States would submit its requests for injunctive

2  relief, the City can respond.

3       THE COURT:  For the life of me, I'm not even sure I

4  need a brief on that.  Because, without prejudging the issue, a

5  long legal battle has been fought here.  A long and expensive

6  legal battle.  Over a program that has long since passed away.

7  This is not a situation where I found the City liable as a

8   result of a present practice, which would be easy to enjoin and

9   reshape in a manner or fashion that was consistent with the

10   dictates of Lanning.  But aside from telling them don't do it

11   anymore -- I mean there comes a point where enough is enough.

12        MS. SEELEY:  Certainly, your Honor.  The one thing

13   that I think should be noted is that this program passed away

14   long after this lawsuit was filed.  So it wasn't something that

15   the United States was suing on that had already been gone.

16   Secondly, the City did fight this and their position through

17   trial and possibly through appeal is that this is a perfectly

18   good physical agility test, which I presume means they would

19   like to go back to it if given the opportunity.  Given that,

20   the case law is pretty clear that the simple voluntary

21   cessation of the practice is not enough to make that move.  If

22   the court determines otherwise, if an equitable --

23        THE COURT:  I have a lot of discretion on the

24   equitable side.  All right, thank you.  Let me make this

25   suggestion.  First of all, your suggestion about exploring


22


1   earlier rather than later whether there could be some paradigm

2   for settlement before everybody starts off on another discovery

3   road and briefs and everything, I think that makes a certain

4   amount of sense to me.  Does the City have any interest in

5   exploring that possibility?  I know the City had a complete

6   turnover in administration, but I presume before you came here

7   today you had an opportunity to speak to some people?

8        MR. VILLELLA:  Well, we certainly remain open to the

9   possibility of settling it in a manner which is advantageous to

10  everybody.  Possibly to minimize the costs, the outlay of extra

11  time and money.  We will certainly make proposals and

12  counterproposals to them.  Depending upon what they're willing

13  to look at.  I can again tell you, confirm that I believe every

14  police officer that was hired from 2004 has been laid off.  I

15  think they've gone into the 2002 list, also.  I don't think I'm

16  wrong, I think they only hired seven or eight officers in 2004

17  and they've laid off more than that.

18        THE COURT:  Are they laying off on the basis of

19  seniority?

20        MR. VILLELLA:  Right, the union contract requires

21  that.  There may be some others who were hired in 2002 that are

22  still on the street, but I think some of them have been laid

23    off.  I think the only other issue -- with the situation we had

24    with the opportunity to re-apply, the cases they're citing, the

25    methodology they developed in giving financial compensation to

23

1    people who didn't even re-apply, was drawn from a lot of

2    disparate treatment litigation in which people were basically

3    dissuaded because it was felt, they got the impression,

4    reasonable impression that nobody wanted them there.  Whereas,

5    we had a structured and periodic relegation procedure that was

6    constantly being modified to accommodate the kinds of concerns

7    that were being raised and litigated.  We think that's also a

8    major factor in why some of the people who didn't come back in

9    '98 after '96, shouldn't be considered to be plaintiffs.  As a

10    matter of fact we brought in a couple of our female police

11    officers who failed the first time and tried the second time

12    and were hired.

13          THE COURT:  You can sit down, Mr. Villella.  Let me

14    make this suggestion.  I'm going to get off the bench and I'm

15    going to have you folks come into chambers briefly.  We'll talk

16    a little bit about some of the options here.  And then before

17   you go today, I'm probably going to enter an order directing

18   the filing of some type of briefs.  Because I just don't think

19   this whole damage concept has been sufficiently hammered out

20   yet so we can really see, if this thing goes forward, where

21   it's going to go and in the form that it might take.  And we'll

22   talk about discovery periods and things like that.

23           (Whereupon, at 2:05 p.m., proceedings recessed in

24   Courtroom C; and reconvened in Judge's Chambers.)

25           (Discussion held off the record.)


                                24


1            (Back on the record at 2:20 p.m. in Judge's

2    Chambers.)

3            THE COURT:  I'm going to propose Friday, January

4    27th, at 9:00 a.m., as the proposed settlement conference date.

5    As we indicated a little bit earlier, each of you are to speak

6    with your respective superiors, of course you on behalf of the

7    United States, and you on behalf of the City, to confirm that

8    that's acceptable to them.  As soon as is conveniently

9    practical, but hopefully within the next 10 days or no more

10   than two weeks, I would expect you would be forwarding to Mr.

11   Villella a formal written settlement proposal.  Something he

12   will be able to take to his superiors over at the City for

13   review.  It will also be my intention that in the event that

14   both sides want to follow through with the settlement

15   conference, prior to that there be some meaningful back and

16   forth so you just don't come in here cold.  Insofar as the

17   setting of any other dates, discovery dates relative to the

18   damage aspects of this case, etc., it makes more sense to me to

19   postpone that until such time as we determine whether or not

20   the case can be settled.

21        (Discussion held off the record.)

22        THE COURT:  Let's go back on the record.  At this

23   conference the United States' attorneys will come, I presume,

24   with full authority or they'll bring somebody that has full

25   authority.  And in order to make this a meaningful conference,


                          25


1   I would want the Mayor to be here, and any other individual

2   that you think is necessary in order to resolve it at that

3   meeting if it looks like it's going that way.

4        MR. VILLELLA:  I'll do as much as I can to get other

5    City Council members.

6          THE COURT:  Let me put it this way.  If you were

7    here by yourself at a settlement conference and a proposal was

8    made which you were going to recommend or seek approval of, who

9    would it be, what would you do in the normal course of business

10   to get approval on behalf of the City of Erie?

11         MR. VILLELLA:  I would make sure my own superior,

12   the solicitor, would be on board with it, have him either

13   directly talk to the Mayor or I would talk to the Mayor myself.

14   If there was an administrative decision to do that, then go

15   down to City Counsel for approval.  Talk to a couple members to

16   see if there's any problem.  Same thing here.  The only thing

17   about a possible problem is if we came to some agreement, on

18   the other side of the coin if somebody were -- it might be some

19   officers of the FOP, some of the senior officers might have

20   that motivation to not like what was proposed.

21         THE COURT:  Look it, I'm not going to hold a

22   settlement conference unless I can settle the case.

23         MR. VILLELLA:  I'll do as much as I can.

24         THE COURT:  You'll do more than that.  You are going

25   to insure that there are people here who have authority, if

1    they so choose, I'm not twisting anybody's arm, but I'm not

2    going to take the time to set up the conference if you don't

3    have people here who are going to do it.  Rather than making a

4    phone call to Greg Karle, I want Mr. Karle here as well in his

5    capacity as the city solicitor.  All right, I think that's it.

6

7            (Whereupon, at 2:26 p.m., the proceedings were

8    concluded.)

9

10                    - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


27


1          C E R T I F I C A T E
           _ _ _ _ _ _ _ _ _ _

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6    correct transcript from the record of proceedings in the

7    above-entitled matter.

8

9

10

11   _____

12   Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25