1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3
UNITED STATES OF                    :
4    AMERICA,                       :
          Plaintiff                 :
5                                   :
               v.                   :   CA-04-4-Erie
6                                   :
CITY OF ERIE,                       :
7         Defendant                 :

8

9

10

11

12

13          Fairness Hearing held in the above-captioned

14     matter on Thursday, June 15, 2006, commencing at

15     9:38 a.m., before the Honorable Sean J. McLaughlin,

16     Federal Courthouse, 17 South Park Row, Erie, PA 16501.

17

18

19

20

21

22

23

24

25                  Reported by Sonya Hoffman
                 Ferguson & Holdnack Reporting, Inc.

1                    A P P E A R A N C E S

2

3       Joseph B. Spero, Esquire
        (For the Police Relief and Pension Association)

4

5       Sharon Seeley, Esquire
        (For the United States of America)

6

7       Gerald J. Villella, Esquire
        (For the City of Erie)

8

9       Kenneth A. Zak, Esquire
        (For the City of Erie)

10

11      Caleb Nichols, Esquire
        (For Ethel Easter)

12

13      Marsha Hernandz
        (For herself)

14

15      Christopher Cimballa, Esquire
        (For the Fraternal Order of Police, Lodge No. 7)

16

17      Frances Booth
        (For herself)

18

19

20                        I N D E X

21

22      Fairness Hearing . . . . . . . . . . . 3

23      Order of Court . . . . . . . . . . . .31

24

25

1      THE COURT:  Good morning.  Please be seated.  This is

2  the time that we've set for the Fairness Hearing with

3  respect to the proposed Consent Decree at Civil Action 04-4.

4      I have received and reviewed a number of objections to

5  the proposed decree and/or just commentary on it.  Of those

6  objections, only a certain number of people actually asked

7  to be heard at the hearing today.  And I suppose in terms of

8  moving it along, I guess what I would propose to do is this:

9      I'm going to indicate the name of the individual, I'm

10  going to go right through the list, and if you're here and

11  you had asked to speak, I'm going to permit you to be sworn

12  at the podium.  And then as it is appropriate, either

13  counsel for the City or counsel for the United States, I'm

14  going to give you an opportunity to come up and address any

15  of the objections or concerns that may have been raised.

16      That having been said, is -- and if I mispronounce any

17  of these names, I apologize in advance.  Is Mr. Gregory

18  Baney, Jr. here -- actually, I apologize, Mr. Baney had not

19  requested to speak.  I was looking at the wrong pile.

20      Is a representative of the Police Relief and Pension

21  Association present?

22      MR. SPERO:  Yes, Your Honor.

23      THE COURT:  Do you want to come up.  Identify yourself

24  for the record, please.

25      MR. SPERO:  Joseph Spero for the Police Relief and

1  Pension Association of Erie, Pennsylvania.

2       THE COURT:  All right.

3       MR. SPERO:  Your Honor --

4       THE COURT:  Although, it probably is not going to be

5  technically necessary, we're going to swear everyone in as

6  they come up.  So would you please swear Mr. Spero.

7

8       J O S E P H   S P E R O, first having

9       been duly sworn, testified as follows:

10

11      THE COURT:  All right, sir.  Go ahead.

12      MR. SPERO:  The Pension Association recognizes the fact

13  that retroactive seniority is defined in the Consent Decree,

14  as entered by yourself, as "seniority for all purposes,

15  except for purposes of pension benefits."  Nevertheless, the

16  Pension Association has some concerns regarding the

17  vagueness of the definition for pension benefits in

18  retroactive seniority.

19      Specifically, there's going to be an actuarial impact

20  on the Pension Association as well as the City because for

21  purposes of determining contributions as well as the

22  benefits, actuarial tables are going to be used for the

23  funding and the administration.  Taking into account in

24  those actuarial tables are going to be the age of the

25  individual, date of hire, their wages; so part of the

1    calculation -- as well as a mortality table; so part of

2    these calculations for retroactive seniority, we're saying

3    doesn't directly affect and isn't supposed to be calculated

4    for purposes of pension, the pension is going to be

5    indirectly affected by these potential hires in that they're

6    going to be getting credit for service where they haven't

7    served.

8        And if I'm reading your Consent Decree correctly,

9    they're going to be admitted at a certain wage, they're

10   going to get certain credits, and these matters get rolled

11   into the calculations for pension benefits.  For age and

12   anniversary dates, these are going to be affected.  Final

13   pay per the City ordinance is defined as including regular

14   pay, longevity increments, holiday pay, and paid

15   contributions through the plan by the participant.  Again,

16   while the retroactive seniority dates for this individual

17   hire is not going to be calculated, the longevity

18   increments, the holiday pay, those are being taken into

19   account for these individual hires which are going to skew

20   the Pension Association contributions and the actuarial

21   tables that are being used.

22       For the three-year -- well, it's the Reverse Drop

23   Program that the City had entered into with the police

24   pension whereby police officers can elect a lump-sum

25   distribution at the time of retirement and look back

1    anywhere from one to three years.  Now, that one- to

2    three-year period is based on their final pay.  So again, we

3    have a final pay issue and the retroactive seniority for

4    dates of hire and things of that nature.

5         Now, all of these matters may or may not have been

6    taken into account by the United States and the City of Erie

7    when they entered into this Consent Decree, and that's why

8    we did file our objection with the Court to look for a

9    little clarification on these issues as to how both the City

10   as well as the Pension Board should handle these issues in

11   the event that these individuals are hired with this

12   retroactive seniority so that we don't end up in front of

13   either Your Honor or another judge some years down the road

14   with people having a problem with this Consent Decree and

15   how their pension is supposed to be calculated.

16        Finally, there is the issue regarding vesting, which is

17   12 years of continuous service.  So if we're reading the

18   Consent Decree correctly, if an individual is hired and

19   they're immediately given credit for eight years of service,

20   but not for pension purposes, then they're going to have to

21   work an additional -- their 12-year period to vest for their

22   pension.  So they're going to have 12 years for pension

23   purposes, but 20 years for credit within the Police

24   Department.  Again, that goes to the longevity, the holiday

25   pay, and final base pay, and things of that nature, which,

1   again, all get rolled up into the pension plan.

2       THE COURT:  All right.  Thank you very much, Mr. Spero.

3   Ms. Seeley, do you want to come on up.

4       MS. SEELEY:  Your Honor, we did attempt to take the

5   affect on the pension fund into effect when we negotiated

6   the Decree.  We did look at the ordinance of the statute.

7   It is very complicated and I'm sure we didn't understand it

8   as well as Mr. Spero does, but I think that what we tried do

9   is to be very simple in the Decree and in the definition say

10  that retroactive seniority didn't apply to pension benefits.

11      We think that what that means in terms of vesting, I

12  think, is easy.  It does mean that the person work would

13  actually have to work 12 years in order to vest, not be

14  credited with retroactive seniority for that purpose.  In

15  terms of the other effects, I think that the only effect

16  that it would have on the pension is certainly a person's

17  age, is a person's age.  And if the person is older now than

18  they were when they would have been hired, there's not much

19  we can do about that.  I think the real age has to be used.

20      And by the same token, the actual salary, which does

21  depend to some extent on longevity pay and essentially

22  seniority, that will be different than it would have been if

23  this were a completely new hire.  But I think those are the

24  only respects in which it's different to age and pay.

25      THE COURT:  Is there anything else you want to say on

1    this point?

2          MS. SEELEY:  No.

3          THE COURT:  How about on behalf of the City?

4          MR. VILLELLA:  Yes, Your Honor.  As you will recall,

5    this issue of retroactive seniority was one of the most

6    contentious problems that we presented when the settlement

7    negotiations were going on.  We felt that there would be a

8    lot of objections to it, as there have been.  We do see that

9    the definition of retroactive seniority does say that it's

10   seniority for all purposes except for purposes of pension

11   benefits, consideration --

12         THE COURT:  That's way too fast for the court reporter.

13         MR. VILLELLA:  All right.  That the retroactive

14   seniority defined in the definitions of the Consent Decree

15   is seniority for all purposes except for purposes of pension

16   benefits, consideration, or eligibility for promotion, or

17   requirements for completion of a probationary period.

18         How the actuary would deal with that in calculating the

19   individual -- pension of an individual who was hired subject

20   to this, I can't tell for certain.  I don't know how much of

21   an impact it is, but certainly the consideration they

22   brought up is well-taken.  We don't think it was sufficient

23   enough for us not to enter into the Consent Decree.

24         THE COURT:  What do you mean the position they've taken

25   but for it is well-taken; what do you mean by that?

1          MR. VILLELLA:  Their concern certainly is one which we

2     would expect them to be raising in that they would react to

3     even the terminology of retroactive seniority to mean that

4     people would be getting paid for years service that they did

5     not accrue.  And to some extent that may be true, but,

6     however, it is excluded from the definition of -- seniority

7     pension is excluded from the definition of retroactive

8     seniority.

9          THE COURT:  All right.  Thank you.  Is Judith Garcia

10    here?  All right.  Is Ethel Easter, through her counsel,

11    here?

12         MR. NICHOLS:  Judge, I'm Caleb Nichols representing

13    Ethel Easter.

14         THE COURT:  Come on up to the podium, Mr. Nichols.

15    Would you swear in Mr. Nichols, please.

16         MS. SCIBETTA:  Would state your name for the record,

17    please.

18         MR. NICHOLS:  Ethel Easter.

19         THE COURT:  No.  You're not Ethel Easter.

20         MR. NICHOLS:  I'm sorry.  What did you say?

21         THE COURT:  She said state your name for the record.

22         MR. NICHOLS:  Caleb Nichols, representing Ethel Easter.

23

24         C A L E B  N I C H O L S, first having

25         been duly sworn, testified as follows:

 1

 2      THE COURT:  Mr. Nichols, just to move it along, having

 3  read the objection in Ms. Easter's objection, as I

 4  understand it, she's complaining -- tell me if this

 5  oversimplifies it, she's complaining that she, in fact, took

 6  the PAT test but does not show up on the list of potential

 7  eligibles; is that right?

 8      MR. NICHOLS:  That's exactly correct, Your Honor.

 9      THE COURT:  What can you tell me about that in terms of

10  when she took the test, how many times she took the test,

11  and what evidence you have that she took the test?

12      MR. NICHOLS:  As her counsel, she has represented to

13  me --

14      THE COURT:  I'm going to want to hear from her

15  directly; is she here?

16      MR. NICHOLS:  She's not here.  She now resides in

17  Houston, Texas.

18      THE COURT:  Well, that makes it very difficult, but go

19  ahead.

20      MR. NICHOLS:  She is -- as her counsel, she's

21  represented to me that she took the test in 1996 and she was

22  then employed with the Police Department as a

23  CSO/Communication Specialist.  And, I believe, she said that

24  she commenced employment with the Police Department in 1995.

25  Because her name did not appear on the list, she filed a

1  petition -- an objection and a petition asking that her name

2  be placed on the list.

3      I do have a letter here from a former official of the

4  City who attests to the fact that Ms. Easter did take the

5  test, that she took the physical exam.  I have a letter from

6  him.

7      THE COURT:  Who is it?

8      MR. NICHOLS:  Homer Smith.  He was then serving as the

9  EEO/Labor Compliance Officer for the City of Erie and he

10  attests to that she did, in fact, take the test.

11      THE COURT:  Let me see the letter.

12      MR. NICHOLS:  (Complies.)

13      THE COURT:  Mark it as Easter Exhibit No. 1.

14          (Easter Exhibit No. 1 marked for identification.)

15      MR. ZAK:  Your Honor, if it please the Court, we have

16  not received a copy of that.

17      MR. NICHOLS:  I will get a copy.

18      THE COURT:  I'll have this one brought back as soon as

19  I'm done reading it.  Well, this is what it says, and then

20  I'll give you a copy.  Do you have a copy?  For the record,

21  it's from Homer L. Smith, dated June 14, 2006, "To whom it

22  may concern:  Please be advised that I served in the

23  capacity of the EEO/Labor Compliance Officer for the City of

24  Erie from the period of May 1989 through September 2005.

25  During this time I was involved with assisting and

1    recruiting minorities and women to apply for police and fire

2    candidates.  In 1996 Ethel Easter, who had been hired by the

3    City of Erie as a CSO/Communications Specialist Officer,

4    completed an application for police officer for the City of

5    Erie and took the physical exam.  If you should require

6    additional information, feel free to contact me at," the

7    phone number, signed Homer L. Smith, Jr.

8        Is there anything else that you want to tell me about

9    this?

10       MR. NICHOLS:  That's all, Your Honor.  She asked that I

11    represent her on this particular point.

12       THE COURT:  Where is she now?

13       MR. NICHOLS:  She's now employed with the Police

14    Department in Houston, Texas.

15       THE COURT:  All right.  Thank you.  Let me hear from

16    the City on this.

17       MR. VILLELLA:  Your Honor, we would object to the

18    letter as being hearsay --

19       THE COURT:  Come up to the podium, please.

20       MR. VILLELLA:  First of all, I think we would object to

21    Mr. Smith's letter in that he should be available and this

22    is a letter which doesn't allow him to be questioned about

23    as to its content that's be offered to the truth of the

24    matter asserted.  But, beyond that, of course --

25       THE COURT:  Let me ask this:  How were the rolls of the

1  people who took the PAT test maintained and what effort or

2  efforts did the City make to determine whose names

3  appropriately appeared on those lists?

4      MR. VILLELLA:  The City Civil Service Board kept the

5  roster of all the applicants who applied for the test, took

6  the test, failed or passed, and would do that each year --

7  every two years that the test was administered.

8      The records for 1996 and '98, unfortunately, copies of

9  them were discarded or destroyed by someone who used work in

10  the human resources office, sometime perhaps in 2001 or

11  2002.  No one asked the Solicitor's Office whether we should

12  maintain them.  At that point, the Justice Department had

13  not filed suit or had not indicated they were going to do

14  so.  No one knew that these records might be important.  And

15  during the discovery process in the lawsuit, it was

16  determined that we no longer have records showing the

17  applications of the people who took the test in 1996 and

18  1998.

19      I believe Justice has more information that they were

20  able to glean from additional sources as to who took the

21  test or didn't take the test in '96 or '98, and they cannot

22  confirm that Ms. Easter did take it.  And we need to know

23  whether --

24      THE COURT:  Well, I'll ask them.  But at least insofar

25  as the City is concerned, the City, by virtue of discarding

1    the records for '96, has no independent way of confirming

2    whether she took the test or not; is that right?

3        MR. VILLELLA:  At this point I would say that we don't

4    have any way of confirming that, other than asking

5    individuals who were there at the time whether they remember

6    her taking it or don't remember her.

7        THE COURT:  Let me hear from Ms. Seeley on this point.

8        MS. SEELEY:  Your Honor, Mr. Villella is correct that

9    the City apparently discarded the 1996 applications, so they

10   don't have the actual application files.  However, there was

11   a document provided to us during discovery that the United

12   States used to create the list of the 1996 applicants that

13   appears in Appendix 8 of the Decree.  And that was part of

14   the Appendix that we filed with our brief, Exhibit No. 13,

15   which it was handwritten, but it was only prepared by the

16   City apparently at the time of applicants.  And it indicated

17   who passed and who failed the physical agility test.  And

18   that was one of the things that we looked at to determine

19   whether Ms. Easter did take the test, and she doesn't appear

20   on that list.

21       I do agree with Mr. Villella that it's a little bit

22   difficult without having either Mr. Smith or Ms. Easter here

23   to probe how they remember that it was 1996.  And one issue

24   with that, Your Honor, is that, if you recall, the same test

25   was given in the same location in 1994.  So it's possible

1    that she took the test in 1994, same place, same test, and

2    they're mistaken about the date.  But without being able to

3    question them about that, we don't know.

4        One thing, if I may, Your Honor, a suggestion as to

5    what we could do at this juncture without witnesses here is

6    that the United States wouldn't object if the Court wanted

7    to add her to Appendix A conditionally --

8        THE COURT:  Conditionally?

9        MS. SEELEY:  Yes.  And then if at the -- by the time of

10   or at the individual fairness hearing, which will occur some

11   months from now after we've had actual claims, she can

12   establish that she did, in fact, apply during those dates

13   and she's otherwise qualified and she will finally be added.

14       THE COURT:  All right.  Thank you.  Someone in the back

15   had their hand raised a minute ago.  Do you want to come up.

16   Come on up to the microphone there.  Do you want to tell me

17   your name, please.

18       MS. HERNANDZ:  Marsha Hernandz.

19       THE COURT:  Would you spell it for the court reporter.

20       MS. HERNANDZ:  M-A-R-S-H-A H-E-R-N-A-N-D-Z.

21       THE COURT:  All right.  Swear her in, please.

22

23       M A R S H A   H E R N A N D Z, first having

24       been duly sworn, testified as follows:

25

1     THE COURT:  The only thing I'm going to ask you to do

2  is speak directly into the Mic.  What is it you wanted to

3  add?

4     MS. HERNANDZ:  Just wanted to comment, when he brought

5  it up, that his client wasn't on the list because I do know

6  a few people that took it and passed it and they're not on

7  the list.  The list is actually just people that failed.

8     THE COURT:  You're talking about the list that was

9  maintained by the City.

10     MS. HERNANDZ:  Yes.  But I wasn't aware at that time

11  when I raised my hand that there was a missing list for '96

12  and '98.

13     THE COURT:  Okay.  Thank you very much.  Is that

14  Counsel's understanding that the list only included failed

15  applicants?

16     MS. SEELEY:  No, Your Honor.  Appendix A to the Decree

17  only includes failed applicants, but the actual list of

18  applicants that we got from the City that Appendix A was

19  based on were people --

20     THE COURT:  People who took it and passed it and took

21  it and didn't pass it.

22     MS. SEELEY:  Yes, Your Honor.

23     THE COURT:  All right.  Is Sabrina Thompson here?  All

24  right.  It wasn't clear to me that this individual had

25  requested to speak or not because her objections were not

1    filed on the regular form.  Officer Mark Sanders, is he

2    here?  All right.  Those are all the individuals that my

3    records reflect had specifically requested to speak.  Is

4    there anyone else who believes that they had and I

5    inadvertently missed them?

6        MR. CIMBALLA:  Yes, Your Honor.  My name is Chris

7    Cimballa on behalf of the Fraternal Order of Police.

8        THE COURT:  Come on up.  Would you please spell your

9    name for the court reporter and we'll swear you in.

10       MR. CIMBALLA:  Okay.  It's Christopher Cimballa,

11   C-I-M-B-A-L-L-A.  I represent Lightman and Welby and the

12   Fraternal Order of Police, Lodge No. 7.  And to expedite

13   things, Your Honor, I'm speaking on behalf of Lodge No. 7,

14   as well as its membership.

15

16       C H R I S T O P H E R   C I M B A L L A, first

17       having been duly sworn, testified as follows:

18

19       MR. CIMBALLA:  Your Honor, I have an exhibit, if I

20   could present it to you.

21       THE COURT:  All right.

22       MR. CIMBALLA:  The exhibit is the collective bargaining

23   agreement between the City and the Fraternal Order of

24   Police, Lodge No. 7.  In addition to the master agreement,

25   you'll also find two amendments.  This agreement is current

1    from January 1, 2006 through December 31, 2008.

2         Our principal objection, Your Honor, is the retroactive

3    seniority provided by the Consent Decree.  There are several

4    provisions of the collective bargaining agreement that are

5    affected.  Principally, the claimants were never parties to

6    this bargaining unit.  In addition, it's my understanding

7    that they haven't taken the written, oral, psychological

8    exams --

9         THE COURT:  If the claimants had been parties to the

10   bargaining unit, we never would have been here --

11        MR. CIMBALLA:  That's correct.

12        THE COURT:  -- because they would have been police

13   officers, presumably.

14        MR. CIMBALLA:  Right.  That is correct.  With respect

15   to the bargaining agreement, this --

16        THE COURT:  Let me ask you this, maybe I can focus our

17   discussion; specifically, what aspects of the collective

18   bargaining agreement as it presently exists, in your view,

19   does the Consent Decree collide with, if you will?

20        MR. CIMBALLA:  Okay.  To begin with, we have Article 4,

21   Section A, Subsection 2 dealing with the hours of work.

22   I've just taken the provision in pertinent part under

23   Subparagraph A that you see here.

24        Now, the bargaining agreement provides that the

25   officers work a somewhat rotation, and that rotation is

1  their schedule for one given month.  If you read the
2  agreement here, if the Chief is under a circumstance where
3  he had an insufficient number of qualified volunteers to
4  work that one-month schedule for a second month, he may pick
5  and choose which officer will work that schedule for an
6  additional month -- the same schedule for an additional
7  month.  This is done by seniority, the least senior officer
8  will be forced to work that schedule.
9      In addition in Article 6, Section C, Subsection 1
10  dealing with vacations, if -- if there's a minimum manpower
11  requirement in the bargaining unit and two officers picked
12  conflicting vacation schedules, the officer to actually get
13  that vacation schedule will be determined by seniority, once
14  again.
15      Article 6, Subsection D2, again, the officer --
16  officers are allowed to pick their vacation schedules and
17  the, I guess, procedure or format in which they pick their
18  schedules -- the order in which they pick their vacation
19  schedules is done by seniority.  The most senior officer is
20  allowed to choose his vacation first and then it works down
21  the line to the least senior.
22      Article 7, Subsection A3, Subpart C dealing with light
23  duty, if an officer suffers an injury or illness related to
24  a work incident, he may be eligible for light duty.  If
25  there are two officers that suffer a work-related injury and

1   there's only one position -- one light-duty position

2   available, the most senior officer will get that position.

3        Finally, Article 13, B6 Subpart A, in a situation in

4   which the City has to make a cutback in personnel, the

5   contract provides that layoffs will start with the last

6   officer hired.  Those four parts of the bargaining agreement

7   are affected by the Consent Decree -- principally affected

8   by the Consent Decree.

9        THE COURT:  Five parts.  I think it's five parts; isn't

10  it?

11       MR. CIMBALLA:  I'm sorry, five parts.

12       THE COURT:  A through D.

13       MR. CIMBALLA:  Yes.  The FOP's consent is required

14  because it binds the union to a compromise which alters its

15  contractual rights.  The FOP has a clear contractual right

16  in the present and current collective bargaining agreement

17  and that cannot be altered without the FOP's approval.

18       In addition, I think that there's a public policy

19  concern here.  A hypothetical situation could be found in

20  the last provision that I referenced, Article 13, dealing

21  with layoffs.  If the City should be forced to lay off

22  personnel, they would lay off the least senior person.  If

23  an officer hired maybe three or four years ago is considered

24  less senior than one of the claimants because that claimant

25  may have taken the test in 1998, for example, the least

1    seniority officer, that officer has three or four years

2    experience, would be laid off before that rookie who might

3    not have any training.  So as a matter of public policy

4    concern, we think that's another issue.

5        If you will allow us to, I would like to submit a brief

6    outlining our --

7        THE COURT:  I won't allow that.

8        MR. CIMBALLA:  Okay.  That's all we have.

9        THE COURT:  Thank you very much.  I'll get you in

10   second.

11       MS. SEELEY:  Your Honor, I would just like to preface

12   everything I say in this regard by pointing out that I hope

13   the Court is already aware that the United States is not

14   insensitive to the concerns of the incumbent police officers

15   or the union in negotiating one of these decrees.  We

16   certainly did think about that and talked about it.  We

17   understand what the issues are and we took care of what

18   seemed to be the most important issue at the time by

19   providing that retroactive seniority does not apply to

20   promotions so that someone is not going to be promoted who's

21   not qualified and not be promoted over other officers who

22   are qualified because of seniority.

23       But legally, the one thing that I heard said that is

24   simply incorrect as a matter of law is that the FOP's

25   consent is required for this Consent Decree, and it simply

1    is not.  The Supreme Court had said that in a Title VII

2    case, retroactive seniority is a necessary component of

3    make-whole relief.  So regardless of whether the union

4    agrees or objects, the Supreme Court had said that a Consent

5    Decree can provide, and should provide, retroactive

6    seniority.

7         At the same time, though, the concerns of the union and

8    of its members are relevant to whether the Decree is fair

9    and should be entered, and we think it is.  The effects of

10   the retroactive seniority that may be provide under the

11   Decree are not unimportant, but they're fairly minimal.  At

12   most, it will go to five priority hires.  The furthest back

13   it can possibly go is to March 1997.  And it's normal in

14   these kind of cases that, in fact, the people who are still

15   seeking hire in a job like this, are the ones who applied

16   most recently.  So it's possibly that all priority hires

17   would come from the 2002 list and there would be even less

18   retroactive seniority awarded.

19        Other than that, I would just reiterate that this is --

20   the Supreme Court has said that there is always a balance

21   that has to be struck in a Title VII case providing the most

22   make-whole relief possible, it's very important.

23        THE COURT:  Let me ask you to come back up to the

24   podium just for a second, if you would.  And I apologize,

25   would you give me your name again, there's been so many

1    people coming up and down.

2        MR. CIMBALLA:  Chris Cimballa.

3        THE COURT:  Mr. Cimballa, do you disagree with the

4    Government's position, which is supported by Supreme Court

5    law, that Title VII in the context of a Consent Decree

6    trumps collective bargaining agreements?

7        MR. CIMBALLA:  It's my understanding that Title VII

8    trumps collective bargaining agreements where those parties

9    whom were discriminated against were originally parties to

10   the collective bargaining agreement.  I could be wrong, but

11   that was my understanding of the law.

12       THE COURT:  Well, everybody could be wrong on

13   something.  I think you are, but fundamentally, I want to

14   make sure I have your major point.  Your major point is, if

15   I take it right, that the terms and conditions of the

16   Consent Decree insofar as it affects members of the

17   bargaining unit, should not be implemented because the

18   members of the bargaining unit had no input into the Consent

19   Decree; is that essentially it?

20       MR. CIMBALLA:  That is correct, Your Honor.

21       THE COURT:  Does the City have anything they want to

22   say on this point?

23       MR. VILLELLA:  Yes.  Just in general, in terms of a

24   response to the FOP and to the individual officers, the

25   concerns they've raised, those officers and the FOP assisted

1    with the defense of this case in the liability phase.  We

2    certainly have expressed thanks to them before, we're very

3    grateful that they cooperated with this and we presented the

4    case the best we could.  The Court ruled in the United

5    States' favor.  And initially I thought that judgment,

6    itself, was immediately appealable to the 3rd Circuit.  Upon

7    further research we determined that it was not, we'd have to

8    wait for the damages phase to be completed.

9        And in that scenario, the Court encouraged settlement,

10   made itself available --

11       THE COURT:  But to the point that they're making about

12   the Title VII insofar as it conflicts with collective

13   bargaining agreements, et cetera.

14       MR. VILLELLA:  Well, the Consent Decree would, of

15   course, be a determination of this Court, that would be the

16   only place that someone challenging it could go, and that

17   would be -- and I think that would outweigh the collecting

18   bargaining interest that they're raising.  That's our

19   impression when we signed onto it, we realize that there are

20   individual arguments that could made to the contrary.

21       The impact that the officers are concerned about would

22   deal with the possibility, the potential, that someone would

23   be hired as one of the priority hires that were calculated.

24   First of all, the number of five that was calculated, I

25   think, was extrapolated -- was in my mind a good

1    extrapolation of what we had -- of what real evidence we had

2    from the 2002 test, which we determined that there was

3    perhaps one female officer who had passed the written test,

4    which was given before the physical test, had a high enough

5    score that she may well have been hired had she not failed

6    the physical agility test that year.

7        So extrapolating that over the four administrations of

8    the test when the prior administrations had a lot more

9    female failed applicants, the number five seemed to be a

10   fair number of the potential lost female hires.

11       Now, we'll address it again, and it's been addressed

12   before, no one of these five priority hires is going to be

13   hired unless they are currently able to be police officers.

14   They must pass the physical testing that is now done.  They

15   must pass the Civil Service, must pass psychological and the

16   background check.  So -- and the potential remains that no

17   one would be hired from this list of priority hires.

18       So if they're thinking that the impact is that five

19   people are going to come on tomorrow and have five or 10

20   years of seniority and have all these rights over and above

21   current officers, that's just not going to happen.  No one

22   is going to be a police officer in the City of Erie unless

23   they are currently able to be a police officer.  And the

24   only advantage of being on this priority hire list is that

25   you're going to be selected to come -- to come in first

1    without, perhaps, going through the regular process of

2    applying.  You're still doing to have to pass the test and

3    do everything else that's necessary.

4        And I think that's all we can really say, Your Honor.

5        THE COURT:  All right.  Thank you, Mr. Villella.  Now,

6    is there anyone else here who both filed written objections

7    and requested to speak?  Did you file written objections,

8    ma'am?

9        MS. BOOTH:  Yes, I did.

10        THE COURT:  What is your name?

11        MS. BOOTH:  Frances Booth.

12        THE COURT:  Why don't you come up here, I couldn't

13    catch that.

14        MS. BOOTH:  My name is Frances Booth.

15        THE COURT:  Could you spell it.

16        MS. BOOTH:  B-O-O-T-H.

17        THE COURT:  Kathy, do we have that one somewhere here?

18    I don't have you down here.  We have no written objection

19    filed by you.  Does the United States?  I want to make sure

20    that I just didn't miss it.

21        MS. SEELEY:  Your Honor, we do not -- we did not

22    receive a written objection.  Ms. Brown, our paralegal,

23    tells me that she has spoken with Ms. Booth on the phone,

24    but we never received an objection.

25        THE COURT:  Did you file a written objection?

```
 1        MS. BOOTH:  Yes, sir.  I brought one down here on May
 2   the 4th because I was out of town and I didn't get into
 3   Pennsylvania until the 29th and that was a Saturday.
 4        THE COURT:  I'm just trying to figure out where it is.
 5   Who did you drop it off with?
 6        MS. BOOTH:  I brought it to that office where I picked
 7   up my copy, and the lady in there told me --
 8        THE COURT:  Where you picked up your what?
 9        MS. BOOTH:  A copy of everything, the list, everything
10   that was taking place from the previous hearings.
11        THE COURT:  Were those being distributed at the City of
12   Erie?
13        MS. BOOTH:  Yes.  Whatever office that is -- 104, Room
14   104.
15        THE COURT:  Do you have something from --
16        MR. VILLELLA:  I don't remember her name.  It would
17   take a few minutes for us to look to see in the system.
18        THE COURT:  Let's do it this way -- let's, first of
19   all, swear you in.
20
21        F R A N C E S   B O O T H, first having
22        been duly sworn, testified as follows:
23
24        THE COURT:  Before we get started here, now that you've
25   been sworn, let me ask you, are you absolutely certain that
```

1  you filled out -- Kathy, show her one of these forms so she

2  can refresh her recollection -- that you filled out one of

3  those forms and timely submitted it?

4      MS. BOOTH:  Yes, sir.  That was stapled onto one of the

5  packets that they had gave me.  And they told me to take it

6  out and bring it back in.

7      THE COURT:  All right.  Given the fact that any piece

8  of paper in this world is capable of being misplaced or

9  lost, I will take you at your word that you filed an

10  objection and hear what you have to say.

11     MS. BOOTH:  The reason why I did file the objection was

12  because I did take the agility test and I did take the Civil

13  Service test in 2002.  At the time my name was Frances

14  Greene, I was married two and half months ago and I changed

15  it to Frances Booth.

16     THE COURT:  At the time you took the test it was

17  Greene?

18     MS. BOOTH:  Yes, sir.

19     THE COURT:  When did you take it the test?

20     MS. BOOTH:  I took it in 2002.  And as I went over the

21  list, I noticed there were women on that list that I

22  actually did take the test with.  And so when I called the

23  litigation office -- that's how I ended up with all my

24  information because the lady said that I was on a list

25  there, but I was not on a list that was printed out here.

1    And I know two other women that's not on that list that also

2    took that test with me.

3        THE COURT:  So let me make sure I understand what your

4    concern is.  Your concern is you took the test in 2002, but

5    you do not appear on the list of eligibles -- potential

6    eligibles in the court papers; is that right?

7        MS. BOOTH:  Exactly.

8        THE COURT:  So you are in the -- you feel you're in the

9    same situation as Ethel Easter; is that right?

10       MS. BOOTH:  Yes, sir.

11       THE COURT:  Do you have any paperwork or documentation

12   that would reflect that you took the test?

13       MS. BOOTH:  No.  But I can get that because I did not

14   know that I had to bring that here today.  I was waiting to

15   hear back and I thought someone woiuld, like, reply back to

16   me regarding my objections of what I should and should not

17   bring.  But I do have where I spoke with Jackie -- I know

18   her as Jackie Radcliff because I cannot pronounce her

19   married name.

20       THE COURT:  Well, that's all right, but who is she?

21       MS. BOOTH:  She used to be a police detective here.

22   She was a black police woman.  I understand that she's no

23   longer with the Police Department, she retired from what I

24   was told.

25       THE COURT:  Was she there when you took the test?

1        MS. BOOTH:  She's the one that gave me all the

2   information to get me to the test.  She gave me my

3   application when I came down here and did everything.

4        THE COURT:  All right.

5        MS. BOOTH:  She was my information source, basically.

6        THE COURT:  I understand.

7        MS. BOOTH:  Thank you, sir.

8        THE COURT:  Ms. Seeley, I propose to do the same thing

9   with Ms. Greene that we're going to do with Ms. Easter,

10  which is conditionally putting her on the list subject to

11  both of those individuals proving that up at the time of any

12  individualized fairness hearing.

13       MS. SEELEY:  Certainly, Your Honor.  No objection to

14  that.

15       THE COURT:  Is there anybody else, then, who submitted

16  a written objection along with a request to speak that I

17  have inadvertently overlooked?  All right.  I'm going to

18  take a short recess and I'm going to come out and -- come

19  out then and rule on this.  All right.

20

21            (Recess taken from 10:22 a.m. to 10:35 a.m.)

22

23

24

25

1

2                    O R D E R   O F   C O U R T

3

4        THE COURT:  Please be seated.  This is going to be an

5    order.  If I go too fast for you, let me know.

6        By the way of background, this action, brought by the

7    United States under Section 707 of Title VII of the Civil

8    Rights Act of 1964, arises from allegations that The City of

9    Erie violated Title VII since at least 1996 by utilizing a

10   physical test, herein after referred to as a PAT test, to

11   screen applicants for employment as entry-level police

12   officers.  It has been the United States' contention that

13   the PAT, as used by the City, disproportionately excluded

14   females from consideration for hire and that PAT was neither

15   "job related" for the position of entry-level police officer

16   nor "consistent with business necessity."  These proceedings

17   were then bifurcated into two phases, the first being the

18   liability phase and the second being the relief phase.

19       On October 8th, 2004, we found that the United States

20   had successfully established a prima facie case of

21   discrimination by demonstrating that the City's use of the

22   PAT disparately impacted female applicants.  It then became

23   the City's burden to prove that the PAT was both "job

24   related" and "consistent with business necessity", as

25   required under 42 U.S.C. Section 2000e-2(k)(1)(A)(i).  That

1   matter was then tried before this Court from March 7th

2   through March 10, 2005.  And on December 13, 2005, this

3   Court issued Findings of Fact and Conclusions of Law in

4   which we ruled that the City had failed to prove by a

5   preponderance of the evidence that the PAT as utilized was

6   both job related and consistent with business necessity.  We

7   therefore concluded that the City's use of the PAT violated

8   Title VII and judgment was entered in favor of the United

9   States as to the liability phase.

10          Before engaging in relief-phase discovery, the

11  parties negotiated the terms of the instant Consent Decree.

12  On March 10, 2006, this Court provisionally approved the

13  Decree, subject to this hearing, the purpose of which is to

14  consider the fairness of the Decree's terms in light of any

15  potential objections.  To that end, notice of these

16  proceedings was previously sent to all potential claimants

17  and to incumbent City police officers.  In addition, notice

18  was published in the Erie Times-News.  To date, some 55

19  objections and comments have been submitted to the Court,

20  which we will discuss in further detail below.

21          As an initial matter, I touched briefly on the

22  applicable, legal standard governing the approval of a

23  Consent Decree in a Title VII case.  "Congress enacted Title

24  VII ... to assure equality of employment opportunities by

25  eliminating those practices and devices that discriminate on

1    the basis of race, color, religion, sex, or national

2    origin."  Alexander versus Gardner-Denver Co., 415 U.S. 36,

3    44 (1974).  "In enacting Title VII, Congress expressed a

4    strong preference for encouraging voluntary settlement of

5    employment discrimination claims."  Carson versus American

6    Brands, Inc., 450 U.S. 79, 88 n. 14 (1981).

7            Because of this long-recognized preference for

8    settlement of employment discrimination claims, courts have

9    adopted a deferential toward consent agreements in Title

10   VII.  See United States versus City of Miami, 614 F.2d 1322,

11   1332-33 (5th Cir. 1980); United States versus New Jersey,

12   1995 WL 1943013 at Page 10 (D.N.J. Mar. 14, 1995).

13   Accordingly then, our role in a fairness hearing such as

14   this is limited to determining whether the "settlement is

15   fair, adequate, and reasonable."  United States versus New

16   Jersey.  A consent decree negotiated in a Title VII action

17   "carries with it the presumption of validity that is

18   overcome only if the decree contains provisions which are

19   unreasonable, illegal, unconstitutional, or against public

20   policy." United States versus City of Alexandria, 614, F.2d

21   1358, 1361 (5th Cir. 1980).

22           We begin now by reviewing, first, the salient

23   provision of the Consent Decree.

24           First, the Consent Decree bars the City from

25   future use of the PAT or any other physical ability test

1    that would violate Title VII relative to the selection of

2    entry-level police officers.  To ensure this protection, the

3    City is required to obtain the agreement of the United

4    States or the approval of this Court if it wishes to utilize

5    any physical ability test to screen applicants for

6    entry-level police officer positions, other than the test

7    used to determine eligibility for entry into the police

8    academy (which test is also currently used by the City).

9    Given our finding of liability on the part of the City, an

10   award of prospective injunctive relief is appropriate.  See

11   International Brotherhood of Teamsters versus United States,

12   431 U.S. 324, (1977).  While this provision bars further use

13   of the unlawful PAT, it allows continued use of the physical

14   standards currently employed by the City and provides a

15   mechanism whereby the City can develop new physical agility

16   test standards in the future consistent with Title VII's

17   mandates.  Having reviewed the responses submitted in

18   connection with this hearing, we perceive no serious

19   objections to this aspect of relief.

20          Second, the Consent Decree contains provisions

21   allowing for individual remedial relief, including monetary

22   relief, and for some potential claimants, remedial hiring

23   coupled with an award of retroactive seniority.

24   Specifically, the Consent Decree provides that the City will

25   pay a total of $170,000 in four installments to be

1   distributed among eligible claimants using a "shortfall/pro

2   rata" procedure.  This calls for a calculation of the number

3   of female entry-level police officers the City would have

4   been expected to hire on a statistical basis absent its use

5   of the PAT.  That anticipated number minus the actual number

6   of female hires constitutes the "shortfall".  Otherwise

7   stated, the "shortfall" is the number of entry-level police

8   officer jobs presumptively denied the female applicants

9   because of the City discriminatory conduct.  Once the

10  shortfall is determined, the amount of wages those workers

11  would presumably have earned is calculated and the total

12  fund is then distributed on a pro-rata basis among the

13  claimants.  See EEOC versus Chicago Miniature Lamp Works,

14  640 F. Supp. 1291, 1298 (N.D. Ill. 1986).  See also United

15  States versus State of New Jersey, supra, at Page No. 5.  In

16  this case, the City estimates that it would have hired no

17  more than three additional female police officers in the

18  absence of the PAT, while the United States estimates that

19  it would have been 7 to 10 additional female hires.  The

20  amount of monetary relief was based upon a compromise

21  shortfall of 5 additional hires.

22          Based upon this same presumed hiring shortfall,

23  the Consent Decree provides that the City will hire up to,

24  but no more than, 5 qualified claimants for the police

25  officer position before hiring other new entry-level police

 1    officers.  Several points need to be emphasized here.

 2    First, under the terms of the Consent Decree, the City is

 3    not required to make any priority hires until after it has

 4    recalled all of those incumbent officers previously laid off

 5    as a result of the City's recent budget difficulties.  Thus,

 6    officers currently laid off are entitled to the first job

 7    openings.  Second, only persons who are otherwise qualified

 8    for hire at the time they failed the PAT and who presently

 9    qualify for the position will be eligible for priority

10    hiring relief.  The City will have an opportunity to

11    challenge the qualifications of any claimant requesting

12    hiring relief and, at a second hearing to be held at a

13    subsequent date, this Court will make a determination as to

14    whether any particular individual is eligible for hiring

15    relief.  Thus, the Consent Decree does not require the City

16    to hire any unqualified individual.  Third, the Consent

17    Decree recognizes the possibility that, ultimately, there

18    may be fewer than 5 claimants who express any interest in a

19    priority hiring and who are found to be currently qualified

20    for such relief.  In that event, the City will be required

21    to hire only those claimants, if any, who are found to be

22    currently qualified for the position in question.  Again,

23    the terms of the Consent Decree will not require the City to

24    hire 5 females if fewer than 5 are found to be currently

25    qualified for the job or if fewer than 5 express an interest

1    in being hired.

2           Finally, the Consent Decree provides that

3    claimants hired as priority hires will be awarded

4    retroactive seniority upon completion of their probationary

5    period.  However, such retroactive seniority will not be

6    used for purposes of determining pension benefits nor will

7    it be used to determine an individual's eligibility for

8    promotion.  In this fashion, the Decree ensures that an

9    award of retroactive seniority will not result in the

10   advancement of any priority hire into a position for which

11   she does not have the required experience.

12          To ensure that Title VII's purposes are fully

13   realized, "Congress provided the courts with great

14   discretion in designing remedial relief and granted them the

15   full equitable powers necessary to implement that relief."

16   United States versus State of New Jersey supra, at Page 19.

17   In assessing the appropriateness of the Consent Decree's

18   terms of relief, we are guided by the principle that "the

19   injured party is to be placed, as near as may be, in the

20   situation he would have occupied if the wrong had not been

21   committed."  Albemarle Paper Co., 422 U.S. at 418-19.  Thus,

22   courts have employed a wide range of equitable remedies,

23   including reinstatement or hiring of employees, with or

24   without back pay, and awards of retroactive seniority.  See

25   Franks, 424 U.S. at 763-65.

1          As noted, it is the Court's function to determine
2    whether the Consent Decree is fair, adequate, reasonable,
3    lawful, and consistent with the public interest.  To inform
4    our assessment under this standard, we consider several
5    facts borrowed from the class action settlement context, as
6    set forth by the 3rd Circuit in Girsh v. Jepson, 521 F.2d
7    153, 157 (3d Cir. 1975) - namely:
8          (1) the complexity, expense and likely duration of
9    the litigation...; (2) the reaction of the class to the
10   settlement...; (3) the stage of the proceedings and the
11   amount of discovery completed...; (4) the risks of
12   establishing liability...; (5) the risks of establishing
13   damages...; (6) the risks of maintaining the class action
14   through trial...;  (7) the ability of the defendants to
15   withstand a greater judgment...; (8) the range of
16   reasonableness of the settlement fund in light of the best
17   possible recovery...; (9) the range of reasonableness of the
18   settlement fund to a possible recovery in light of all the
19   attendant risks of litigation...
20         Other courts have considered additional factors
21   such as the presence of collusion, the opinion of competent
22   counsel, and the presence of a governmental participant.
23   See United States versus State of New Jersey, at Page 11.
24         In this case, turning to the first factor, though
25   the relevant issues have been straightforward in a legal

1   sense, the case has been factually complex and heavily

2   dependent upon evidence from expert witnesses.  Trial of the

3   liability phase included testimony from four different

4   experts in such fields (among others) as exercise physiology

5   and physical testing, industrial/organizational psychology

6   and employment test validation.  Because of the necessary

7   involvement of various experts, these proceedings have been

8   costly thus far.  Were litigation to proceed to the damages

9   phase, expert testimony would again be required, thus

10  further adding to the parties' already significant expenses.

11  The case is already approximately two and a half years old

12  and a resolution of the damage phase would likely take many

13  months, if not a year or more, to resolve, since the parties

14  have not yet embarked on damage-related discovery, and since

15  ligation of damage-related issues would likely involve

16  individualized challenges relative to various claimants

17  entitlement to relief.  If one of the parties were to file

18  an appeal, this would only add to the expense and duration

19  of litigation.  Therefore, on balance, this factor favors an

20  approval of the Consent Decree.

21          With respect to the reaction of the class of this

22  settlement, the United States has prosecuted this action on

23  behalf of approximately 90 potential claimants, all of them

24  being females who applied for the position of entry-level

25  police officer with the City of Erie between January 1, 1996

1   and December 31, 2002 and who failed the PAT during that

2   time span.  Of the potential claimants only three have

3   submitted comments or objections relative to the Consent

4   Decree and, in addition, two individuals have asserted that

5   they were wrongly excluding from the list of potential

6   claimants.  Based on a general lack of objection from the

7   potential claimants, this factor favors approval of the

8   Consent Decree.

9        With respect to the stage of the proceeding, as of

10  this date, substantial litigation has occurred.  The

11  liability phase of the case has already been decided

12  adversely to the City.  Significant discovery relative to

13  the damage phase has not yet been undertaken but the

14  parties, through the course of extensive settlement

15  negotiations have had an opportunity to develop their

16  respective theories on the damage issue.  The current stage

17  of the proceedings and discovery completed thus far both

18  favor approval of the settlement.

19       As noted, the City's liability through its use of

20  PAT between 1996 and 2002 has already been established

21  following a nonjury trial before the Court.  Although the

22  City may yet have the right to appeal that ruling, in this

23  Court's view, it is unlikely that the liability judgment

24  would be overturned on appeal.  That is because the Court's

25  liability determination was heavily dependent upon factual

findings and turned in large part on the Court's evaluation
of the credibility of competing expert witnesses - issues
which would be reviewed on appeal under a deferential
standard.  Therefore, the City's adverse liability judgment
is a factor which should support the City's interest in a
consensual settlement.

        With respect to the risk of establishing damages,
while the City's liability for its use of the PAT has
already been determined, the Court acknowledges that the
likely outcome relative to the potential damages in this
case is as yet undetermined and harder to predict.  In fact,
the United States acknowledges that it is impossible to
determine with any certain which claimants would have been
hired but for the City's use of the PAT.  This is due both
to the passage of time (in some cases up to 10 years) since
the discrimination occurred and also to the fact that those
who failed the PAT were not permitted to proceed further in
the application process.  As one objector has noted,
multiple steps are involved in the City's selection of new
police officers:  Applicants must pass a written exam, which
involves the adjustments of test scores to account for
veteran's preference points; the best scoring candidates are
also subjected to an in-depth background, a medical exam, a
phycological exam, and a lie detector test.  Selected
candidates are sent to the Pennsylvania Police Academy for

1  Act 120 certification, which in turn involves five and a

2  half months of academic and physical training.  Thus, as to

3  any particular claimant in this case, it may be unclear

4  whether, for example, the individual would have successfully

5  completed the written exam or passed the required

6  psychological background check.

7         Nevertheless, the impossibility of pinpointing

8  which claimants would have been hired in the absence of the

9  PAT does not defeat the United States' claim for damages.

10  Instead courts have held that, where discrimination has been

11  established but it is not possible to determine with

12  reasonable certainty which claimants would have been hired

13  absent the unlawful practice is appropriate to use a

14  "shortfall" method to calculate monetary relief.  See

15  Chicago Miniature, 640 F. Supp. at 1298-1300.  Here, the

16  total amount of monetary relief offered under the Consent

17  Decree is the result of the parties' compromised presumption

18  that as many as five additional females would have been

19  hired by the City between 1996 and 2002 in not for the

20  City's use of the PAT.  This estimate accounts for the fact

21  that not all women who failed the PAT during the years in

22  question would have successfully completed the other steps

23  in the selection process.  It also reflects the anticipated

24  effect that veterans preference points would have had on the

25  expected number of women hired.

1        The total amount of monetary relief to be paid

2    under the Consent Decree ($170,000) is based on an estimate

3    of the amount that would have been earned by five

4    entry-level police officers if they had been hired from 1996

5    through 2002 eligible list, less an estimate of the amount

6    they would have earned in mitigation.  As the United States

7    explained, even if we could determine that an individual

8    claimant would have been hired and earned $30,000 per year

9    as a City police officer, if she had earned $25,000 per year

10    in another job, she would be entitled to recover only

11    difference ($5,000 per year) rather than the full $30,000.

12    Here, the parties have agreed to a monetary award of

13    $170,000, representing an average of $34,000 for each of the

14    five shortfall positions.

15        With respect of the ability defendant to withstand

16    a greater judgment, though we have acknowledged that the

17    issues and proof relative to establishing damages is less

18    well-defined than that with respect to the liability, still

19    the City's precarious financial situation must be factored

20    into our analysis.  The City's contribution under the

21    Consent Decree of $170,000 toward a monetary relief award

22    already represents a significant financial hardship.  It is

23    highly doubtful that the City could withstand a greater

24    judgment in the event that the United States was successful

25    in its damage case.  As we discuss below, it is the position

1    of the United States that as many as 7 to 10 female

2    applicants would have been hired by the City as entry-level

3    police officers if not for the PAT.  Should the Unites

4    States prevail on this issue, the costs of the City in terms

5    of backpay and full-blown retroactive benefits would be

6    significantly greater.  Accordingly, because the City is not

7    without risk in defending the damages portion of this case,

8    and because the City likely be unable to withstand a

9    judgment greater than the amount paid out under the Consent

10   Decree, this factor weighs in favor of approving the

11   settlement.

12          Finally, I note that there has been no evidence of

13   collusion in connection with the Consent Decree.  It is

14   supported by the opinion of competent counsel and the

15   presence of a governmental participant all weigh in favor

16   approval of the Consent Decree.  See Officers for Justice,

17   688 F.2d at 625.

18          I now turn to the specific objections that have

19   been filed to the Consent Decree.  To date, some 61

20   responses to the Consent Decree have been filed by various

21   persons or organizations, including 55 incumbent police

22   officers, the Fraternal Order of Police No. 7, "FOP", the

23   Police Relief and Pension Association of Erie, Pennsylvania,

24   and several potential claimants.  We note that of the 55

25   objections filed by incumbent police officers, 50 were

1    identical to those submitted by the Fraternal Order of

2    Police No. 7.  Thus, in all, 11 distinct responses have been

3    received.  We agree with the Plaintiff that the comments and

4    objections set forth in these responses generally fall into

5    1 of 10 categories, which I will now discuss in turn.

6        Some of the objectors have expressed disagreement

7    with this lawsuit in principle, objecting to the Justice

8    Department's decision to prosecute the employment

9    discrimination claims in the first place and disputing the

10   merits of this Court's previous liability judgment.

11   Objections have been raised to the effect that, for example,

12   there is no federally "right" to employment as a City of

13   Erie police officer; the Court erred in finding that the

14   challenged PAT was "not job related and consistent with

15   business necessity;" the courts should not been involved in

16   matters affecting the standards of this job; the Court

17   failed to recognize that some woman who took the PAT

18   actually passed it; and, by virtue of the Court's judgment,

19   all persons who failed the PAT, for whatever reason, can now

20   raise employment discrimination claims.

21       The short answer to these objections is that they

22   are irrelevant for present purposes because the purpose of

23   today's hearing is not to debate the wisdom of Congress'

24   mandate as set forth in Title VII.  Nor is it the purpose of

25   today's hearing to relitigate the merits of the government's

1    disparate impact claim.  The claim was already fully

2    litigated during the course of a 4-day bench trial, which

3    resulted in this Court's issuance of a 73-page Findings of

4    Fact and Conclusions of Law.  This Court's liability

5    judgment stands.  And the purpose of our business today is

6    to determine whether in light of that ruling as it presently

7    stands the terms of settlement as set forth in the Consent

8    Decree are lawful, fair, reasonable, adequate, and

9    consistent with public interest.

10            In any event, the Court has duly considered the

11    objections raised in relative to the merits of the

12    underlying liability judgment and finds no basis therein for

13    rejecting the Consent Decree.

14            Some comments suggest that the Consent Decree is

15    unfair to people who passed the PAT but did not get hired

16    because of other reasons, such as not scoring high enough on

17    the written exam.  As to this objection, the United States

18    correctly observes that it was the PAT, and only the PAT,

19    which was alleged and found to have an unlawful

20    discriminatory impact under Title VII.  No other employment

21    practice utilized by the City was challenged by the United

22    States or found to be unlawful.  Accordingly, the group of

23    individuals potentially entitled to relief under the Consent

24    Decree is appropriately limited to those harmed by the PAT.

25            One potential claimant objects that the amount of

46

1   monetary relief available under the Consent Decree is

2   insufficient because that amount is less than what she

3   estimates she would have earned if she had been hired by the

4   City.  However, as the court in the United States versus

5   State of New Jersey recognized, it is important to note that

6   the United States' role as Plaintiff in this action:

7          The United States represents the interest of all

8   citizens, including, but not limited to those women ... who

9   were denied employment opportunities as a result of the ...

10  discriminatory hiring practices engaged in by the

11  (Defendant)...

12         The United States must seek to obtain justice for

13  as many victims as possible while balancing its limited

14  resources.  As the Third Circuit observed:

15         The Attorney General's prosecution of a (Title

16  VII) suit is governed by desire to achieve broad public

17  goals and the need to harmonize public policies that may be

18  in conflict; practical considerations, such as where limited

19  public resources can be concentrated most effectively may

20  dictate conduct of a suit inimical to the immediate

21  interests of the dsicriminatee, who presumably seeks full

22  satisfaction of his individual claim regardless of the

23  effect on other cases.

24         Bryan versus Pittsburgh Place Glass Co., 494 F.2d

25  799, 803 (3d Cir. 1974)...  While the United States may seek

1    to compensate individuals believed to be victims of

2    discrimination, it also seeks to protect public rights,

3    which may conflict at times with the interest of

4    individuals.

5          Therefore, the United States' decision to settle

6    its claim through a Consent Decree cannot be evaluated

7    solely in terms of the remedies that it provides to those

8    persons subject to allegedly illegal discrimination, but

9    rather, must be considered in light of the public policy or

10   eradicating noncompliance with Title VII and furthering its

11   purpose of providing equal employment opportunity for all.

12         In sum then, one claimant's dissatisfaction with

13   the amount of the proffered monetary award is not

14   dispositive as to the adequacy of the settlement and does

15   not control my analysis for purposes of this hearing.

16         Moreover, when the monetary recovery is considered

17   on its merits, this Court finds the amount of the award to

18   be adequate, fair, and reasonable under the circumstances.

19   As previously explained, the total amount of monetary relief

20   offered under this Consent Decree is the result of the

21   parties' compromised presumption that as many as five

22   additional females would have been hired by the City between

23   1996 and 2002 if not for the City's use of the PAT.  The

24   $170,000 recovery fund is based on an estimate of the amount

25   that would have been earned by those five female entry-level

1    police officers if they had been hired from 1996 through

2    2002 eligible lists, less an estimate of the amount they

3    would have earned in mitigation.  Title VII requires that

4    amounts earned in mitigation or could have been earned using

5    reasonable diligence should be subtracted from the amount of

6    backpay to be awarded to victims of discrimination.  I find

7    that the use of a five-person shortfall is reasonable in

8    light of the parties' competing estimations with respect to

9    damages.  Further, I find that basing an award on an assumed

10   recovery of $34,000 for each shortfall position is

11   reasonable and appropriate to account for mitigation damages

12   as required by Title VII.

13          I also find that it is fair to require the

14   $170,000 monetary award to be divided among all eligible

15   claimants.  I note that each claimant's share of the

16   monetary award will be determined after this Decree is

17   entered and the potential claimant's have been given an

18   opportunity to make a claim for monetary and/or hiring

19   relief.  Any objections to the shares allotted to each

20   claimant will be taken up by this Court in a second fairness

21   hearing to be held at a later time.  If it were

22   theoretically possible to determine with certainty whether a

23   particular applicants who failed the PAT would have passed

24   all the other steps in the City's selection process and been

25   hired, then only those applicants who would have actually

1    been hired would be eligible for monetary relief as we

2    previously observed, however, it is impossible in retrospect

3    to make such a determination because of the fact that the

4    City did not allow individuals who failed the PAT to

5    continue on in the selection process.  Under the

6    circumstances, then, it is appropriate to allow all eligible

7    claimants to have a "pro rata" share in the monetary award

8    even though each claimants' award may wind up being

9    substantially less than the full value of the police officer

10   job she might have obtained in the absence of the PAT.

11   Courts have recognized that, in circumstances such as these,

12   that a "pro rata" approach is "the best that can be done"

13   for the claimants.  See Chicago Miniature, 640 F. Supp. at

14   an 298-1300; EEOC versus Andrew Corp., 1990 WL 92820 at Page

15   2 (N.D. Ill. June 26, 1990).

16          Certain objectors incumbent City police officers,

17   insist that it is unfair to allow all women who failed the

18   PAT to be eligible for relief because even if they had

19   passed the PAT, it is not clear they would have been hired.

20   I do not find this objection meritorious.  First, to

21   reiterate, the total amount of monetary relief offered under

22   the Consent Decree is premised upon the parties' compromise

23   assumption that as many as five additional females would

24   have been hired by the City between 1996 and 2002 if not for

25   the use of PAT.  This estimate by its very nature sets a cap

1    on damages and accounts for the fact that not all woman who

2    failed the PAT during the years in question would have

3    successfully completed the other steps in the selection

4    process.   Second, not all females who failed the PAT will

5    ultimately partake of the settlements proceeds.   Only those

6    who make a claim for monetary relief and who are judged to

7    be eligible for relief will have the right to a pro-rata

8    share.   Disputes, if any, concerning an individual

9    claimant's entitlement to relief, as I said, will be taken

10   up by this Court at a second fairness hearing, if necessary,

11   down the road.

12            Under the terms of the Consent Decree, claimants

13   who are otherwise eligible for hiring relief are not deemed

14   currently unqualified because they presently lack Act 120

15   certification.   One objector suggests that this aspect of

16   the Decree may result in the City hiring individuals who are

17   unqualified for the entry police officer job.   We disagree.

18   First, because of the Act 120 certification was not a

19   prerequisite for applicants (and incumbents) hired from 1996

20   to 2002 eligibility list at issue, it would be inappropriate

21   to impose that as a prerequisite for the claimants here who

22   otherwise qualify for hiring relief.   Second, under the

23   Consent Decree, the City may determine that a claimant is

24   currently unqualified and, thus, not entitled to hiring

25   relief, if the claimant fails the MPOETC physical ability

1    test used to determine entry into the police academy.

2    Third, claimants hired under the Decree, like other hired

3    from 1996 to 2002 eligibility list, will be required the

4    successfully complete the police academy and become

5    certified law enforcement officers once they are hired.

6         A number of objectors have expressed the concern

7    that the retroactive seniority provisions of the Consent

8    Decree will unfairly disadvantage innocent incumbent

9    officers.  The United States acknowledges that it is

10   possible that the awarding of retroactive seniority may

11   place some incumbents lower in the seniority ranks than they

12   would have been if the PAT had never been utilized.

13   Nevertheless, this particular objection does not, in my

14   view, undermine the overall fairness and reasonableness of

15   the settlement.

16        First, awards of retroactive seniority have

17   repeatedly been upheld as an appropriate Title VII remedy

18   and essential to the statute's "make whole" objectives.  See

19   Franks, 424 U.S. at 774-75.  Indeed, the Supreme Court has

20   admonished that "without an award of seniority dating from

21   the time when he or she was discriminatorily refused

22   employment, an individual who applies for and obtains

23   employment ... pursuant to the District Court's order will

24   never obtain his rightful place in the hierarchy of

25   seniority according to which these various employment

1   benefits are distributed."  Franks, 424 U.S. at 767-68.

2            .  Still, in assessing whether an award of

3   seniority relief is fair and workable, courts consider such

4   factors as the number of victims of unlawful discrimination,

5   the size of the incumbent workforce that will be affected,

6   and the impact granting seniority relief will have on the

7   incumbent workforce.  United States versus State of New

8   Jersey supra, at 21.  Here, no more than five qualified

9   claimants will receive hiring relief and retroactive

10  seniority.  Amongst the approximately 200 sworn police

11  officers in the Erie Police Department, the impact of the

12  proposed grants of retroactive seniority will be fairly

13  minimal.  This is especially true because the earliest

14  possible retroactive seniority date is 1997; in reality, it

15  is probable that the earliest actual retroactive dates will

16  be later than 1997, because one would expect that the

17  potential claimants most interested in pursuing hiring

18  relief would be those who had applied with the City most

19  recently and who would have had less time to integrate

20  elsewhere into the workforce.  This means that all incumbent

21  officers hired prior to 1997, or whatever the earliest

22  retroactive date is, will not be affected at all by the

23  retroactive seniority provision.  Moreover, the terms of the

24  Consent Decree specifically provide that grants of

25  retroactive seniority for the priority hires cannot be used

1    either to determine promotions or to determine pension

2    benefits.  And, to reiterate, it is possible under the terms

3    of the Consent Decree that the number of priority hires and

4    corresponding awards of retroactive seniority will

5    ultimately be fewer than five, thereby further lessening the

6    impact on incumbents.  Notably, none of the objectors have

7    demonstrated that the award of retroactive seniority as

8    contemplated in the Consent Decree will, in fact, infringe

9    on their seniority rights.

10            In sum, the award of retroactive seniority as

11    proposed in the Consent Decree is designed to minimize, as

12    far as practicable, any unfair prejudice to the rights of

13    the incumbent police officers.  The seniority rights of

14    incumbents are disrupted only to the limited extent

15    necessary to achieve "make whole" relief for the eligible

16    claimants.  I therefore conclude that this aspect of the

17    Consent Decree is fair, workable, and reasonable.

18            Both the FOP and numerous incumbent officers have

19    objected that the application of retroactive seniority for

20    purposes of anything other than wages will violate the

21    collective bargaining agreement between the City and the

22    FOP.  However, in Zipes versus Trans World Airlines, 455

23    U.S. 385 (1982), the Supreme Court held that, upon a finding

24    of discrimination by an employer, an award of retroactive

25    seniority is appropriate even if it would violate a

1    collective bargaining agreement between the employer and an

2    innocent union.  455 U.S. at 400.  See Independent

3    Federation of Flight Attendants versus Zipes, 491 U.S.

4    754,757 (1989); General Building Contractors versus

5    Pennsylvania, 458 U.S. and 75, 404-05 (1982).

6            In addition, the FOP and numerous police officers

7    object that the use of the retroactive seniority will

8    violate state civil service statutes.  However, under the

9    principles of the Supremacy Clause of the United States

10   Constitution, Title VII trumps any state civil service law

11   that conflicts with its provisions or which "stands as an

12   obstacle to the accomplishments of the full purposes and

13   objectives of Congress." Lawrence County versus

14   Lead-Deadwood School District, 469 U.S. 256, 260 (1985).

15   Thus, state statutes and civil service rules cannot prevent

16   the award of appropriate relief to victims of employment

17   discrimination.  See Kirkland versus New York State

18   Department of Corrections, 711 F.2d 1117, (2d Cir. 1983).

19           Accordingly, I find that those objections lack

20   merit.

21           Similarly, the FOP and numerous incumbent officers

22   object that the use of retroactive seniority will violate

23   incumbents' equal protection rights under both the United

24   States and Pennsylvania constitutions.

25           To begin, I question whether, in fact, the Consent

1   Decree implicates at all Equal Protection concerns, since

2   the Decree arguably creates no gender-base classification at

3   all.  As United States correctly points out, the Decree does

4   not contain any infirmative action provisions, but instead

5   limits the available relief to individuals specifically

6   identified as victims of discrimination.  See United States

7   versus New Jersey, supra, at 18.  Such gender-conscious

8   relief is appropriate to remedy past gender discrimination.

9           Assuming only for the sake of argument that the

10  hiring relief and retroactive seniority provisions do

11  implicate equal protection issues, I find that these

12  provisions easily pass constitutional muster.

13  Classifications based on gender have traditionally been

14  subject to "intermediate" or "heightened" scrutiny such that

15  the classification is constitutional if it is substantially

16  related to the achievement of an important governmental

17  objective.  See Personal Administrator of Massachusetts

18  versus Feeney, and 42 U.S. 256, 272-73 (1979).  Because, in

19  my opinion, the challenged provisions of the consent Decree

20  would easily pass even the "strict scrutiny" normally

21  applied to race-based classifications, they are

22  constitutionally sound.

23          Appendix A to the Consent Decree sets forth the

24  presumptive hire dates for each potential claimant, which is

25  calculated as the earliest date of hire of any applicant who

1    took and passed the PAT when the potential claimant failed

2    the PAT.  The Consent Decree contemplates that this

3    presumptive hire date will be used as the retroactive

4    seniority of the potential claimant if she is offered a

5    position as a priority hire and successfully completes her

6    probationary period.

7           One objector has asserted that because the City

8    used each of its police officer eligibility lists for two

9    years, it is possible that an individual hired under the

10   Decree may be awarded a retroactive seniority date which is

11   earlier than the date on which she actually would have been

12   hired.  Notwithstanding this possibility, I conclude that

13   the retroactive seniority dates are fair and reasonable.  As

14   the United States observes, the parties have agreed to these

15   dates because it is impossible as a practical matter to

16   determine exactly when any given claimant would have been

17   hired had she passed the PAT.  Moreover, considering the

18   small number of priority hires contemplated by the Consent

19   Decree, the limitations placed on the use of retroactive

20   seniority and a likelihood that the claimants receiving

21   priority hire will be those who will receive the least

22   extent of retroactive seniority, this objection fails to

23   dissuade the Court from its conclusion that the priority

24   hiring dates are reasonable.

25           Appendix A to the Consent Decree purportedly lists

1   all individuals eligible for relief and was compiled from

2   the City's existing records of who took and failed the PAT

3   during the relative time period.  I learned at the hearing

4   today that through inadvertence, the City apparently

5   disposed of its formal records of those who the test for the

6   years 1996 and 1998.  Two objectors have come forward

7   claiming that they, in fact, took the test but that the

8   lists which accompany the United States papers does not

9   include them.  One is Ethel Easter and the other is Francis

10  Boothe.  I am going the direct that both those individuals

11  names be added conditionally to the list of eligibles with

12  the understanding that it will be incumbent upon each of

13  those individuals at an individualized fairness hearing to

14  demonstrate the fact that they did, in fact, take the test

15  and are otherwise eligible.

16          Finally, the Pension Association has filed a

17  response seeking to appear at the fairness hearing relative

18  to how the retroactive seniority awarded under the Decree

19  will affect the pensions of individuals hired as priority

20  hires.  As the United States has correctly observed, the

21  Consent Decree specially contemplates that retroactive

22  seniority as awarded under the Decree is not to be used as

23  seniority for purposes of pension benefits.  Thus, because

24  the retroactive seniority awarded under the Decree is solely

25  a "creature of the Decree" and has no meaning or application

1   outside of it, this provision should have no effect, or at

2   most a minimal effect, on the pensions of individuals hired

3   as priority hires.

4            Let me say that again because that was inaccurate.

5   This provision should have no effect on the pensions of

6   individuals hired as priority hires.  Otherwise stated, for

7   pension benefit purposes, individuals offered positions as

8   priority hires will be treated as if they began accruing

9   seniority on the date on which they actually are hired by

10  the City.

11           As the Supreme Court observed:

12           Consent decrees are entered into by parties to a

13  case after careful negotiation has produced agreement on

14  their precise terms.  The parties waive their right to

15  litigate the issues involved in the case and thus save

16  themselves the time, expense, and inevitable risk of

17  litigation.  Naturally, the agreement reached normally

18  embodies a compromise; in exchange for the saving of cost

19  and elimination of risk, the parties each give up something

20  that they might have won had they proceeded with

21  litigation." United States versus Armour & Co., 402 U.S.

22  673, 681 (1971).

23

24           Thank you.  We're adjourned.

25

1          (Hearing concluded at 11:23 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25