IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    PLAINTIFF,<br>V.<br><br>CITY OF ERIE, PENNSYLVANIA,<br><br>    DEFENDANT. | CIVIL ACTION NO. 04-4   ERIE<br><br>JUDGE MCLAUGHLIN<br><br><br>(ELECTRONICALLY FILED) |

**PLAINTIFF UNITED STATES' RESPONSE
TO  OBJECTIONS TO RELIEF AWARDS DETERMINATIONS**

### I.   INTRODUCTION

On September 8, 2006, pursuant to Paragraph 49 of the Consent Decree entered by the

Court on June 15, 2006 (the "Decree"), the United States filed a Relief Awards List.[1]  The Relief

Awards List sets forth the United States' relief determinations for each Claimant who timely

returned an Interest in Relief form.  In addition, for each Claimant the United States determined

is eligible for monetary relief, the Relief Awards List indicates the amount the United States

determined the Claimant should receive.

Pursuant to Paragraph 51 of the Decree, by letter dated October 3, 2006, the United States

gave each Claimant who had requested relief notice of the United States' determination with

respect to her claim.  With each letter, the United States provided  instructions about how the

---

[1]  On November 7, 2006, because the United States had become aware of minor errors in
the List filed on September 8, 2006, the United States filed an unopposed motion to substitute a
corrected Relief Awards List.  The only correction to the September 8, 2006 List that affects any
of the Claimants who have filed objections is that the amount of monetary relief the United
States determined they (and other Claimants) should receive has been increased by $74 on the
corrected List.  Unless otherwise indicated, all references to the "Relief Awards List" in this
memorandum refer to the corrected Relief Awards List.

Claimant could object to the United States' determination. As the instructions indicated, pursuant to Paragraph 52 of the Decree, the Claimants were required to file any objections they might have and provide copies to the parties no later than October 20, 2006.

Pursuant to Paragraph 54 of the Decree, defendant City of Erie (the "City") is allowed to object to the United States' determinations regarding priority hiring relief. The City's objections also had to be filed no later than October 20, 2006. Decree, ¶54. In addition, Paragraph 54 required that the City provide to the United States all documents relating to the City's objections and identify all persons with knowledge of facts supporting the City's objections by October 20, 2006.

Three Claimants, Zabrina Thompson, Trelane Battles Sherrod and Fatima Gibbs, timely filed objections.[2] In addition, on October 20, 2006, the City filed Defendant's Detailed Objections to Relief Awards List ("Detailed Objections"). In the City's Detailed Objections, the City attempted to object to the United States' determinations regarding both priority hiring relief and monetary relief. However, as the United States has established in Plaintiff United States' Memorandum in Response to Defendant's Motion to Compel ("Response to Motion to Compel"), filed on October 23, 2006, the Consent Decree does not allow the City to object to the United States' determinations regarding monetary relief. Therefore, at the Fairness Hearing on Individual Relief scheduled for November 20, 2006, the City is allowed to present only its objections regarding priority hiring relief.

_____

[2] Of the Claimants, only Ms. Sherrod has indicated that she would like to appear and state her objections in person at the November 20, 2006 Fairness Hearing. Although Ms. Gibbs marked both the "Yes" and "No" boxes on her objection form in answer to the relevant question, she later indicated by telephone that she did not wish to speak at the hearing.

Paragraph 53 of the Decree requires that the United States and the City each file a response to the Claimants' objections no later than seven days prior to the Fairness Hearing on Individual Relief. The United States' responses to the Claimants' objections, as well as its response to the City's objections regarding priority hiring relief, are set forth below.

## II.    ARGUMENT

The three Claimants object only to the United States' determinations regarding monetary relief. Their objections fall into two categories: (1) objections to the amount of monetary relief the United States has determined that an eligible Claimant should receive; and (2) objections to the United States' determination that a Claimant should not receive monetary relief. Specifically, Ms. Thompson and Ms. Gibbs object to the amount of monetary relief the United States determined each of them should receive, while Ms. Sherrod objects to the United States' determination that she should not receive any monetary relief under the Decree. Under the standards set forth in the Consent Decree, none of the objections justifies modifying any of the United States' relief determinations.

The City objects to the United States' priority hiring relief determinations regarding Claimants who applied for a police officer position in 2002 and failed the written examination administered by the City in that year but also applied in an earlier year and were not allowed to take the written examination then because they failed the City's unlawful physical agility test (the "PAT"). The United States has explained in its Response to the City's Motion to Compel that the City's assertion that a Claimant's score on the 2002 written examination is proof of how the Claimant would have scored on an earlier written examination is devoid of both logic and evidentiary support. Since the filing of the United States' Response to the Motion to Compel, the

parties have stipulated to a number of facts relevant to the City's assertion. See Stipulations, filed November 8, 2006. As discussed in this Memorandum, the parties' Stipulations establish that, in 2002, the City administered a written examination that is different from any examination the City previously used. Moreover, the parties have stipulated that many applicants who passed the 2000 written examination failed the 2002 written examination. Accordingly, the Court should approve, without amendment, the Relief Awards List filed by the United States.[3]

Before responding to each of the objections, this Memorandum provides a brief explanation of the bases for the United States' relief determinations and a discussion of the standards the Court must apply in ruling on the objections.

## A.    THE UNITED STATES' RELIEF DETERMINATIONS

### 1.    Monetary Relief Determinations

The United States determined that a Claimant should not receive monetary relief under

---

[3] The parties' Stipulations also contradict the City's objections regarding Claimants who did not apply in 2002 and, therefore, were never allowed by the City to take a written examination. The City asserts that these Claimants are ineligible because there is "[n]o evidence of Civil Service [i.e., written examination] passage or equivalent." Detailed Objections, p. 1. However, as explained in the United States' Response to the City's Motion to Compel, the City bears the burden of proving that a Claimant was not qualified for hire. Decree, ¶ 55. In other words, if there is "no evidence," the Court must find that the City's objection is not well-founded. Nonetheless, it should be noted that, based on the evidence of record, each of these Claimants had at least an 83% chance of passing the written examination used by the City at the time she applied, and that the City's presumption that the Claimants would have failed the relevant written examination is incorrect as a matter of fact. As discussed in Section II.C.2., infra, the pass rate on each of the written examinations administered by the City between 1996 and 2000 was 83% or higher. See Stipulations 35-37. In fact, the pass rate of female applicants on the written examinations between 1996 and 2000 was 89% (i.e., 8/9). See Stipulations 18, 20, 43 and 44 and Attachments 3, 4 and 6 to Stipulations (showing Heather Dunkle, Samantha Kinder, Diane Trickey and Marie Wolf passed the 2000 examination; Carol Ponce and Roberta Razkowski passed and Kari Pallotto failed the 1998 examination; and Linda Martin and Carol Ponce passed the 1996 examination).

the Decree in two circumstances. First, the United States determined that a Claimant should not receive monetary relief if it is certain that the Claimant would not have been hired had she passed the PAT. Second, the United States determined that a Claimant should not receive monetary relief if, based on information (such as subsequent criminal history) known to the United States, the United States would not have sought relief for the Claimant had the parties not settled the relief phase of this case.

Once the United States had determined which Claimants should receive an award of monetary relief, the United States determined that each eligible Claimant, other than Cheryl Ann Frey, should receive an equal amount. Fifty-six Claimants returned Interest in Relief forms.[4] The United States determined that forty-five of them should receive monetary relief. As explained below, the United States determined that Ms. Frey should receive $22,035 in monetary relief, and that the rest of the Settlement Fund ($147,965) should be distributed equally to the other forty-four eligible Claimants. Thus, the United States determined that each of the forty-four other eligible Claimants (not including Ms. Frey) should receive $3,362 in monetary relief.

The United States determined that a larger amount of monetary relief should be awarded to Ms. Frey, who applied for a police officer position in 2002, the only year in which the City administered the written examination before the PAT. After administering both the written examination and the PAT in that year, the City rank-ordered its eligibility list in descending order of candidates' written examination scores (including veterans points). Thus, for 2002, the United

---

[4] One Claimant did not timely return the Interest in Relief form and did not have good cause for her failure to do so. Therefore, the United States determined that Claimant was not eligible for relief under the Decree. See Decree, ¶ 48. Another Claimant timely returned an Interest in Relief form but stated that she was not interested in monetary or hiring relief.

States was able to determine whether a Claimant would have been reached on the eligibility list had she passed the PAT, based on her score on the written examination. Among the Claimants who applied in 2002, only Ms. Frey received a written examination score (including veterans points) as high as or higher than Thomas Lenox, the lowest-scoring candidate hired from the 2002 eligibility list. See Docket # 163, Exhibit 2 (indicating that Ms. Frey scored 86 and Mr. Lenox scored 84). None of the other Claimants who failed the PAT in 2002 would have been hired from the 2002 eligibility list because all of them ranked below Mr. Lenox based on their written examination scores. See id. Accordingly, the United States determined that Ms. Frey should receive a larger share of the monetary relief than Claimants who failed the PAT between 1996 and 2000 because there is every reason to believe that she would have been hired had she passed the PAT, given her score on the written examination (as well as her clean criminal and driving record).[5]

---

[5] As the Court is aware, the total amount of monetary relief to be paid to Claimants under the Decree was based on an estimated hiring shortfall of five female police officers. The amount the United States determined Ms. Frey should receive was the estimated value of one of the shortfall positions, calculated using the methodology the United States' statistical consultant had used for settlement purposes. Specifically, the value of one position was calculated by assuming that an unsuccessful applicant would obtain a comparable job in six months and that the value of overtime and benefits would amount to 50% of salary. Based on information provided by the City, the starting salary for an entry-level police officer in 2002 was $24,000. Therefore, the assumed value of one shortfall position from the 2002 eligibility list was ($24,000 x ½) x 1.50 = $18,000. This amount was multiplied by 1.2242 to account for interest since 2002. The resulting figure was $22,035, the amount of monetary relief the United States determined Ms. Frey should receive. It should be noted that, although the total amount of the Settlement Fund, $170,000, represents the value of five shortfall positions, the other four shortfall positions were not valued at the same amount as Ms. Frey's. Instead, for purposes of settlement calculations, it was assumed that the other four positions would have been filled by women who failed the PAT between 1996 and 2000. Each of the 1996-2000 shortfall positions was valued at a different amount due to differences in starting salaries for the various years and additional interest attributed to the period prior to 2002.

The United States determined that each eligible Claimant who applied in a year other than 2002 should receive an equal share of the Settlement Fund after the amount allocated to Ms. Frey was deducted. Because the City did not allow the Claimants from 1996 to 2000 to take the written examination administered in the relevant year, there is no information that would allow the United States to determine that any of the Claimants who failed the PAT between 1996 and 2000 would not have been hired because of her written examination score. Accordingly, the United States determined that each of the forty-four eligible Claimants other than Ms. Frey should receive ($170,000 - $22,035) ÷ 44 = $3,362.

### 2.   Priority Hiring Relief Determinations

Twenty-two Claimants requested priority hiring relief. One Claimant later orally rescinded her request. The United States determined that fifteen Claimants should be awarded priority hiring relief.[6] A Claimant who should not receive monetary relief for either of the two reasons described above also should not receive priority hiring relief. If it is certain that the Claimant would not have been hired had she passed the PAT, or if the United States would not have sought relief for the Claimant in a litigated relief phase, the Claimant should receive neither

---

[6] An award of "priority hiring relief" to a Claimant does not mean that the City will be required to hire the Claimant. See Decree, ¶¶ 7, 31-33. Under the Decree, the City is not required to offer priority hire to any Claimant who is not qualified for the entry-level police officer position at the time the City considers her for priority hire. See Decree, ¶¶ 36, 39. The City will have an opportunity to evaluate the Claimant's qualifications at that time. Decree, ¶ 32. In any case, the City is not required to make more than five priority hires. Decree, ¶ 31. Paragraph 32 of the Decree states, "The City may satisfy the priority hiring requirement of this Decree by hiring any five (5) Claimants Eligible for Hiring Relief and is not required to consider such Claimants in any particular order." Thus, even if a particular Claimant is qualified at the time the City is in a position to hire, the City need not offer the Claimant priority hire if the City hires five other eligible Claimants.

monetary nor priority hiring relief. Thus, the United States determined that no Claimant other than Ms. Frey should receive priority hiring relief in connection with a 2002 application. However, for the reasons discussed below in response to the City's objections, if a Claimant applied in both 2002 and an earlier year, the United States did not consider the Claimant's performance on the 2002 written examination in determining whether she should receive relief in connection with her earlier application.

**B.    STANDARDS GOVERNING OBJECTIONS**

    **1.    <u>Standards Governing the Claimants' Objections regarding Monetary Relief</u>**

The Consent Decree provides the standards the Court must apply in considering the Claimants' (and the City's) objections. Paragraph 49 of the Consent Decree, which states that the United States will make the relief award determinations, puts no conditions on those determinations other than the requirement that the determinations be "reasonable and equitable in relation to the Claimant population and the total amount of the Settlement Fund and . . . consistent with the provisions of this Decree." Decree, ¶ 49. Thus, the Court should amend the United States' determination that a particular Claimant should not receive relief only if the Court finds that the United States' determination is not reasonable and consistent with the provisions of the Decree. In this regard, it should be noted that the provisions of the Decree – specifically, those found in Paragraph 12 – state that the purpose of the individual relief to be awarded under the Decree is to ensure that "individuals who were denied employment in the City's Bureau of Police as a result of the City's unlawful use of the PAT obtain remedial relief." Decree, ¶ 12(c). Of course, that provision must be read in context with the Court's order entering the Decree. <u>See</u> <u>United States v. State of New Jersey</u>, 194 F.3d 426, 431-32 (3d Cir. 1999). In its order, the Court

found that distributing the $170,000 Settlement Fund to all eligible Claimants, rather than

attempting to determine which of them would have been hired absent discrimination, is fair

because it is not possible to determine with any certainty which Claimants would have been

hired:

> I also find that it is fair to require the $170,000 monetary award to be divided among all eligible claimants . . . If it were theoretically possible to determine with certainty whether a particular applicant[] who failed the PAT would have passed all the other steps in the City's selection process and been hired, then only those applicants who would have actually been hired would be eligible for monetary relief. . . . [H]owever, it is impossible in retrospect to make such a determination because of the fact that the City did not allow individuals who failed the PAT to continue on in the selection process.

Transcript of 6/15/2006 Fairness Hearing and Order of Court, pp. 49-50. Thus, it is appropriate

to provide relief to a Claimant if there is uncertainty as to whether the Claimant would have been

hired had she passed the PAT. However, it would not be consistent with the provisions of the

Decree to provide relief to a Claimant who certainly would not have been hired had she passed

the PAT.

With respect to the United States' determination regarding the amount of monetary relief

a Claimant should receive, Paragraph 55 of the Decree provides:

> The Court shall find that any objection regarding the amount of monetary relief to be awarded to a Claimant is well-founded only if the amount is not reasonable and equitable in relation to the Claimant population and the total amount of the Settlement Fund.

The Court already has acknowledged that the impossibility of determining which Claimants

would have been hired if they had passed the PAT justifies a pro rata distribution of the

Settlement Fund. See Transcript of 6/15/2006 Fairness Hearing and Order of Court, pp. 41-42.

Thus, the Court should amend the amount of monetary relief the United States has determined an

eligible Claimant should receive only if the United States does not provide all eligible Claimants

9

a pro rata share of the total amount of relief and there is no reasonable and equitable justification

for the United States' deviation from a pro rata distribution.

### 2.    Standards Governing the City's Objections regarding Priority Hiring Relief

As discussed in Plaintiff United States' Memorandum in Response to Defendant's

Motion to Compel, Paragraph 55 of the Consent Decree provides the standard the Court must

apply in considering the City's objections regarding priority hiring relief. Paragraph 55 provides,

in relevant part:

> The Court shall find that any objection, including any objection made by the City, regarding a Claimant's eligibility for consideration for Priority Hire is well-founded only if the objector(s) prove by a preponderance of the evidence that, at the time she failed the PAT, the Claimant was not qualified for the position of entry-level police officer in the City's Bureau of Police using the lawful, objective hiring criteria in use by the City at that time . . .

Thus, the City bears the burden of proving by a preponderance of the evidence that the Claimants

it asserts are ineligible for relief were not qualified <u>at the time each failed the PAT</u>.

### C.    RESPONSES TO OBJECTIONS

#### 1.    Claimants' Objections

##### a.    Zabrina Thompson

Zabrina Thompson failed the PAT in 2000. She requested monetary and priority hiring

relief.[7] The United States determined that Ms. Thompson is eligible for both forms of relief. As

explained above, the United States determined that Ms. Thompson should receive $3,362 in

monetary relief, the same amount awarded to each of the eligible Claimants other than Cheryl

---

[7] As discussed, <u>infra</u>, Ms. Thompson applied again in 2002 but did not take the PAT in that year because she failed the 2002 written examination.

Ann Frey.

Ms. Thompson objects to the amount of monetary relief the United States determined she should receive. She asks how many other Claimants submitted a timely Interest in Relief form, and indicates that she believes that the United States considered criminal history and driving record in determining "the amount of the relief given." She states that she has no criminal record and has had only parking tickets. Ms. Thompson also provides additional information about her life and background.

To the extent that Ms. Thompson's objection is based on her belief that the United States considered criminal history, driving record or other background information in determining the amount of monetary relief each Claimant should receive, as explained above, her belief is incorrect. The United States considered such information only in determining whether a Claimant should receive any monetary or hiring relief at all. The United States took into consideration the fact that Ms. Thompson does not have a criminal record or a history of moving violations when it determined that she should receive monetary (and priority hiring) relief.[8]

Regarding the amount of monetary relief the United States determined that Ms. Thompson should receive, the only Claimant the United States determined should receive more than Ms. Thompson is Ms. Frey. As explained above, the amount of monetary relief allocated to Ms. Frey is reasonable and equitable because of the virtual certainty that, had Ms. Frey passed

---

[8] In determining whether Ms. Thompson should receive relief, the United States considered the fact that Ms. Thompson disclosed that she had her drivers license suspended for three months because she did not have insurance. The United States determined that Ms. Thompson should receive relief because, although she was not certain of the date of the suspension, she stated that it occurred after she had failed the PAT.

11

the PAT, she (but no other Claimants) would have been hired from the 2002 eligibility list. The United States determined that the rest of the Settlement Fund should be distributed equally among all other eligible Claimants. The Court already has found an equal distribution fair, given the impossibility of determining which of the other Claimants would have been hired. Moreover, almost all of the Claimants had clean criminal and driving records. Ms. Thompson's particular circumstances provide no basis for a finding that it is unfair or inequitable to award her the same amount of monetary relief as the other Claimants will receive.

### b.   Trelane Battles Sherrod

Ms. Sherrod requested only monetary relief, and the United States determined that she should not receive such relief under the Decree. Ms. Sherrod applied and failed the PAT only in 2002, the year in which the City gave the written Civil Service examination before the PAT. The United States determined that Ms. Sherrod should not receive relief because she received a score lower than the lowest-scoring applicant hired from the 2002 eligibility list. Ms. Sherrod admits that the last person hired from the 2002 list obtained a higher written examination score than she did, but asserts that, had she passed the PAT, she could have been hired from the 2002 eligibility list had the City been financially able to hire more police officers from the list. Ms. Sherrod also asserts that, if veterans points were not awarded and applicants were ranked on written examination score alone, she could have been hired from the 2002 list.

Ms. Sherrod received a score of 82 on the 2002 written examination, lower than the score of the lowest-scoring applicant who was hired from the 2002 eligibility list.[9] In other words,

---

[9] Ms. Sherrod scored 82. See Docket # 163, Exhibit 2 (Ms. Sherrod is listed on the third page as "Battles, Trelene C."). She asserts that the last person hired from the 2002 eligibility list

12

even if Ms. Sherrod had passed the PAT, she would not have been hired because the City would have filled all of its available positions before reaching her on the eligibility list. As explained previously, the United States, therefore, determined that Ms. Sherrod should not receive relief because we are certain that she would not have been hired for reasons other than the discriminatory PAT.

Even assuming that Ms. Sherrod is correct when she asserts that she could have been hired from the 2002 eligibility list if (1) the City had been financially able to hire more police officers and (2) the City had not awarded veterans points, the City's failure to hire Ms. Sherrod was not the result of the PAT. It was the result of the City's financial condition and/or its use of veterans points in ranking applicants on the eligibility list. As the Court stated in entering the Consent Decree:

> Some comments suggest that the Consent Decree is unfair to people who passed the PAT but did not get hired because of other reasons . . . . As to this objection, . . . it was the PAT, and only the PAT, which was alleged and found to have an unlawful discriminatory impact under Title VII. No other practice utilized by the City was challenged by the United States or found to be unlawful.

Transcript of 6/15/2006 Fairness Hearing and Order of Court, p. 46. As indicated previously, the explicit purpose of the individual relief provisions of the Decree is to ensure that "individuals who were denied employment in the City's Bureau of Police as a result of the City's unlawful use of the PAT obtain remedial relief." Decree, ¶ 12(c) (emphasis added). Accordingly, the United States' determination that Ms. Sherrod should not receive relief under the Decree is reasonable and consistent with the provisions of the Decree.

_____

scored 12 points higher than she did (including veterans points). That is incorrect. The last person hired, Thomas Lenox, scored 84 (including veterans points). See id.

13

### c.    Fatima Gibbs

Ms. Gibbs applied and failed the PAT in 2000. Decree, Appendix A. The United States determined that Ms. Gibbs should receive monetary relief, the only form of relief she requested. However, Ms. Gibbs objects to the amount of monetary relief the United States determined she should receive because, she asserts: (1) the City intentionally made her fail the PAT when she took it in 2000;[10] (2) she filed a claim with the Pennsylvania Human Relations Commission ("PHRC"), kept in contact with the PHRC and followed this case for over five years; and (3) the United States determined that Ms. Frey should receive more monetary relief than Ms. Gibbs (and other Claimants) because of Ms. Frey's education.[11]

First, as the Court is aware, the United States did not allege in this case that the City engaged in intentional discrimination, and the Court has not found that the City engaged in intentional discrimination. In particular, the United States did not allege, and the Court did not find, that the City intentionally made Ms. Gibbs or any other female applicant(s) fail the PAT. Therefore, to the extent that Ms. Gibbs' assertion that the City intentionally discriminated against her is correct, that fact would not warrant awarding Ms. Gibbs more monetary relief as a remedy for the disparate impact discrimination alleged by the United States and found by the Court.

Second, the fact that Ms. Gibbs filed a claim with the PHRC does not entitle her to a

---

[10]  Ms. Gibbs incorrectly states that she took the PAT in 2001. The PAT was not given in 2001, and the City's records indicate that Ms. Gibbs took and failed the PAT in 2000.

[11]  While Ms. Gibbs did not name Ms. Frey in her objections, she referred to a Claimant who, according to Ms. Gibbs, believes she should receive "$20,000 or $22,000" because the Claimant "went to school." As indicated previously, the United States determined that Ms. Frey should receive $22,035 in monetary relief and that all other eligible Claimants should receive $3,362.

14

larger share of the available monetary relief than the other Claimants. This is a pattern or

practice lawsuit brought by the United States pursuant to Section 707 of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-6. Unlike lawsuits brought by the United

States under Section 706 of Title VII, which must be based on a charge of discrimination filed

with the EEOC and referred by the EEOC to the Department of Justice, lawsuits brought by the

United States under Section 707 are not based on an EEOC charge. Thus, this lawsuit was not

based on a charge of discrimination filed by Ms. Gibbs or any other individual. Accordingly, the

United States does not believe that Ms. Gibbs' PHRC claim and continuing interest in this matter

justify awarding her more monetary relief than the equal share the United States has determined

should be awarded to all Claimants other than Ms. Frey. As the Court stated in entering the

Decree:

> The United States must seek to obtain justice for as many victims as possible while
> balancing its limited resources . . . While the United States may seek to compensate
> individuals believed to be victims of discrimination, it also seeks to protect public rights,
> which may conflict at time with the interest of individuals.

Transcript of 6/15/2006 Fairness Hearing and Order of Court, pp. 47-48 (citing Bryan v.

Pittsburgh Place Glass Co., 494 F.2d 799, 803 (3d Cir. 1974)).

Finally, as explained above, the United States' determination that Ms. Frey should receive

more monetary relief than the other Claimants was not based on Ms. Frey's education. It was

based solely on the fact that Ms. Frey's score on the written examination establishes that she

would have been hired by the City if she had passed the PAT. Because Ms. Gibbs applied in

2000, not 2002, the City did not allow her to take the written examination for the police officer

position, and we cannot determine with any degree of certainty that she would have been hired

from the 2000 eligibility list had she passed the PAT.

### 2.    The City's Objections

As stated previously, the City objects to the United States' priority hiring relief determinations regarding Claimants who failed the 2002 written examination and also applied and failed the PAT in an earlier year. Because the City administered the PAT before the written examination in all years except 2002, the City did not allow such applicants to take the written examinations given at the time they failed the PAT. As indicated previously, however, pursuant to Paragraph 55 of the Decree, the City bears the burden of proving by a preponderance of the evidence that the Claimants to whom the City objects were not qualified at the time they failed the PAT – not at the time, between two and six years later, when they failed the 2002 written examination. Thus, the City asserts that the Claimants who failed the written examination in 2002 (specifically, Saprina Cooper, Denise Osterberg, Tabitha Roberts, Mary Ann Santiago and Zabrina Thompson) were not qualified at the time they failed the PAT, but the City bases its assertion solely on the Claimants' performance on the 2002 written examination.[12]

Although the City was required by Paragraph 54 of the Decree to provide all documents and identify all persons with knowledge of facts relating to the City's objections by October 20, 2006, the City offered no evidence regarding the qualifications of the Claimants other than their

---

[12] For some reason, in the City's Detailed Objections, the City did not list Ms. Santiago as having failed the 2002 written examination. In fact, she failed the 2002 written examination with a score of 64, and she failed the PAT in 1996. Stipulation 34. Therefore, Ms. Santiago's eligibility for priority hiring relief is addressed in this Memorandum because the City's contentions would appear to relate to her as well. Ms. Osterberg failed the 2002 written examination and failed the PAT in 1998. Stipulation 30. Ms. Cooper, Ms. Roberts and Ms. Thompson all failed the 2002 written examination and failed the PAT in 2000. Stipulations 24-26.

scores on the 2002 written examination.[13]  Nonetheless, the United States proposed that the

parties stipulate to relevant facts the United States was able to glean from liability phase

discovery, and the parties filed a set of Stipulations on November 8, 2006.  The Stipulations

directly contradict the City's assertion that the fact that a Claimant failed the 2002 written

examination establishes that she would have failed the written examinations that the City used

between 1996 and 2000.

First, the City has stipulated that, for each of the entry-level police officer selection

processes between 1996 and 2002, the City administered a different written examination than it

had administered as part of the immediately preceding selection process.  Stipulation 11.

Indeed, the City intentionally used different examinations so that applicants would not be able to

memorize the exam questions.  Stipulation 11.

More important, as part of the City's 2002 entry-level police officer selection process, the

City administered a written examination that was different than all of the examinations the City

---

[13]    In it's Detailed Objections, the City referred to only one document in support of its
objections, the "2002 Civil Service test results for all passing and failing applicants."  Detailed
Objections, p. 1; see also Exhibit 1 (letter from S. Seeley to G. Karle, dated October 30, 2006).
The City also identified two individuals, Constance Cook and Daniel Tempestini, as persons with
knowledge "regarding the nature, scope and sources of each Civil Service test given for police
officers."  Id.  In subsequent communications, the City indicated that, if the City is able to obtain
copies of the written examinations the City used between 1996 and 2002, it hopes simply to have
Ms. Cook and/or Mr. Tempestini identify the examination used each year.  See Exhibit 2 (letter
from G. Villella to S. Seeley, dated October 31, 2006); Exhibit 3 (letter from C. Geller to G.
Karle and G. Villella, dated November 1, 2006).  As of the morning of November 6, 2006, when
the United States interviewed Mr. Tempestini and Ms. Cook pursuant to Paragraph 54 of the
Decree – and, indeed, as of the date of this Memorandum – the City had not obtained copies of
any of the written examinations.  Neither Mr. Tempestini nor Ms. Cook was able to provide any
relevant factual information other than that to which, as discussed infra, the parties have
stipulated.

previously had administered because the examination used in 2002 was supposed to have no

adverse impact on minority applicants. Stipulations 12, 13. The 2002 written examination was

the IPMA D-2 Police Officer Exam.[14] Stipulation 50. The 2000 written examination was the

IPMA 175.3 Police Officer Exam. Stipulation 46. While the City purchased both examinations

from IPMA, the two examinations were quite different. As the City has stipulated, according to

IPMA, the 2000 written examination tested the following nine areas: Vocabulary, Filling Out

Standard Forms, Police Procedures and Information, Wanted Posters, Accident Diagrams,

Exercising Judgment, Problem Sensitivity, Scanning Area Maps, and Identifying Themes and

Ideas. Stipulation 47. In contrast, the 2002 written examination assessed the following five

dimensions: Observation and Memory (Wanted Posters), Ability to Learn Police Material, Police

Interest Questionnaire (Non-Cognitive), Verbal and Reading Comprehension, and Situational

Judgment and Problem Solving. Stipulation 52. Clearly, there was little overlap of areas

assessed in the 2000 and 2002 examinations. Indeed, the City has stipulated that 30% of the

questions on the 2002 written examination were part of the "non-cognitive" component of the

examination (i.e., the Police Interest Questionnaire), which is not included in other IPMA police

officer exams. Stipulations 53, 55. According to IPMA promotional materials, the "inclusion of

a non-cognitive testing component raises the validity of these tests, and also serves to markedly

lower their adverse impact on minority group candidates." Stipulation 54. Obviously, if two

examinations produced the same results (i.e., applicants scored essentially the same on both), the

two examinations would have the same validity and the same adverse impact on minority groups.

---

[14] "IPMA" is the test vendor, the International Personnel Management Association.
Stipulation 10.

18

In addition, much of the 2000 written examination tested applicants' ability to memorize and use information provided to them in an IPMA study guide prior to the test date. Stipulations 48, 49. Applicants who took the 2002 written examination were not given materials to memorize prior to the examination date. Stipulation 56. Thus, the City has stipulated to the obvious differences between the 2000 and 2002 written examinations.

Moreover, the results of the various written examinations confirm that the 2002 written examination was quite different than the written examinations the City had administered in previous years. The City has stipulated that the pass rate on the 2002 written examination was approximately 58% – significantly lower than the pass rates on the 1996-2000 written examinations (which ranged from approximately 83% to approximately 85%). Stipulations 35-38. In other words, applicants were more than twice as likely to fail the 2002 written examination as they were to fail any of the previous written examinations.

Despite the Stipulations, the City speculates that the substantial difference in the pass rate on the 2002 examination was not due to any difference in the examination itself but, instead, was due to recruiting the City undertook in 2002 to attract more minority applicants and/or to the fact that the City "subsidized" the minority applicants – i.e., did not require minority applicants to pay the examination fee required of other applicants. According to the City, such recruiting and subsidies may have led less motivated individuals to apply and take the written examination in 2002. The City then posits that these less motivated individuals would not prepare as well for the written examination and, therefore, would be more likely to fail it, leading to the substantially lower overall pass rate in 2002. If one were to speculate, it would seem more likely that the fact that much of the 2000 written examination required applicants to memorize materials in a study

19

guide may account for some or all of the difference in pass rates. An applicant could obtain a

higher score on the 2000 examination by memorizing the study guide. In 2002, however,

applicants had nothing to study no matter how motivated they were.

More important, the City's unsubstantiated theory is contradicted by the parties'

Stipulations regarding individual applicants' performance on the 2000 and 2002 examinations.

Applicants who failed the 2002 written examination and had taken the 2000 written examination

were very likely to have passed the 2000 written examination. Specifically, eighteen applicants

who failed the written examination in 2002 also took the 2000 written examination. Stipulations

22, 23. Fourteen (77%) of those applicants passed in 2000. Id.[15] In other words, applicants who

failed the 2002 written examination had a very good chance of passing the 2000 written

examination. Indeed, they passed the 2000 written examination at nearly as high a rate as the

overall pass rate of 83%.

As indicated previously, the Claimants who failed the 2002 written examination and also

applied in 2000 are Saprina Cooper, Tabitha Roberts and Zabrina Thompson. Stipulations 24-

26. Ms. Cooper, Ms. Roberts and Ms. Thompson all scored between 52 and 64 on the 2002

_____

[15] The scores listed in Stipulation 22 for the 2000 written examination are raw scores,
representing the number of questions out of the 150-question examination the applicant answered
correctly. Stipulations 17, 22 and Attachment 2 to the Stipulations. Thus, to compare the 2000
written examination scores to the scores applicants obtained in other years, it is necessary to
divide the scores listed in Stipulation 22 by 150 to convert the scores to percentages. Because
the City used a cutoff score of 70% on the 2000 written examination (as it had in other years), a
raw score of 105 or above was considered a passing score. All eighteen applicants who failed the
2002 examination and took the 2000 examination received a raw score of 105 or above (i.e.,
passed the 2000 examination) except for Bradley Schell, Jeffrey Cuzzola, Raymond Sisson, Jr.,
and Luis Cruz, Jr. Stipulation 23. All scores referred to above are percentage scores, not raw
scores.

written examination. Stipulations 24-26. Frank Klemm III scored 47 on the 2002 written examination and still passed the 2000 examination with a score of 73 (110/150). Stipulations 22, 23. Moreover, Ms. Thompson is the Claimant who scored 52 on the 2002 written examination. Stipulation 26. To pass the 2000 written examination, Ms. Thompson would have had to score eighteen points higher on it than she scored on the 2002 written examination. Eight of the eighteen applicants who failed the 2002 written examination scored at least eighteen points higher on the 2000 written examination. Stipulation 22.[16] Indeed, Mr. Klemm scored twenty-six points higher on the 2000 written examination than he scored in 2002. Accordingly, the Court cannot conclude that any of the Claimants who failed the 2002 written examination would have failed the 2000 written examination had the City allowed them to take it.

Denise Osterberg applied in 1998 and in 2002. Stipulation 30. The City did not allow her to take the 1998 written examination because she failed the PAT that year. Id. Ms. Osterberg failed the 2002 written examination with a score of 67. Id. To have been considered qualified in 1998, Ms. Osterberg would have had to score only three points higher on the 1998 written examination than she did on the 2002 written examination. As one would expect, there are fewer applicants who took both the 2002 and the 1998 (or 1996) written examinations than applicants who took both the 2002 and 2000 written examinations. Thus, the only applicant who failed the 2002 written examination and took the 1998 written examination is Kristopher May. Stipulations 27-29. Mr. May failed the 2002 written examination with a score of 61. Stipulation

---

[16] The applicants whose scores on the 2000 written examination were at least eighteen percentage points higher than their 2002 written examination scores are: Kevin Matlock, Kristopher May, Stephen Merkle, John Dalton, Jason Morell, Robert Kuhn, Ernest Dickens and Frank Klemm III. Stipulation 22; see n.15, supra.

28.  He passed the 1998 written examination with a score of 73 - twelve points higher.  Id.[17]

Moreover, the City contends that the 1998 and 2000 written examinations were comparable.

Fifteen of the eighteen applicants who failed the 2002 written examination and took the 2000

written examination scored more than three percentage points higher on the 2000 examination

than they did on the 2002 examination.  Stipulation 22.[18]  The Court cannot find that the fact that

Ms. Osterberg failed the 2002 written examination by three points proves that she would have

failed the 1998 examination.

Finally, Mary Ann Santiago failed the written examination in 2002 with a score of 64.

Stipulation 34.  She failed the PAT in 1996.  Id.  Had Ms. Santiago passed the PAT in 1996 and

been allowed to take the 1996 written examination, she would have had to score at least six

points better on that examination than she did on the 2002 written examination.  Stephan Merkle

failed the 2002 written examination with a score of 61 and passed the 1996 written examination

with a score of 76 – fifteen points higher.  Stipulation 32.  The only other applicant who failed

the 2002 written examination and took the 1996 written examination was Kevin Matlock, who

scored 63 in 2002 and passed in 1996 with a score of 73 – ten points higher.  Stipulations 31, 33.

Moreover, fourteen of the eighteen applicants who failed the 2002 written examination and took

the 2000 written examination scored more than six points higher in 2000 than they did in 2002.

---

[17]  In addition, although he did not fail the 2002 written examination, Frankie Morales took the written examination in both 1998 and 2002.  Stipulation 27.  Mr. Morales scored 78 on the 2002 written examination and 84 on the 1998 written examination – six points higher. Stipulation 29.

[18]  The only applicants who did not score more than three percentage points higher on the 2000 examination were Raymond Sisson, Jr., Bradley Schell and Jeffrey Cuzzola.  Stipulation 22; see n.15, supra.

Stipulation 22.[19]  The Court cannot find that the fact that Ms. Santiago failed the 2002 written examination by six points proves that she would have failed the 1998 examination.

In summary, given the parties' Stipulations, the Court cannot find that any of the Claimants at issue would have failed any of the written examinations the City administered between 1996 and 2000.  The City cannot prove by a preponderance of the evidence that any of the Claimants who failed the 2002 written examination and were determined by the United States to be eligible for priority hiring relief were unqualified when they failed the PAT between 1996 and 2000.  Accordingly, the Court must find that the City's objections to the eligibility of Claimants who failed the 2002 written examination are not well-founded.[20]

### III.  CONCLUSION

For the foregoing reasons, the Court should find that the United States' monetary relief determinations regarding Ms. Thompson, Ms. Sherrod and Ms. Gibbs are reasonable, equitable and consistent with the provisions of the Consent Decree.  In addition, for the foregoing reasons, as well as those set forth in the United States' Memorandum in Response to Defendant's Motion to Compel, the Court should find that the City's objections to the United States' determinations regarding priority hiring relief are not well-founded.  Accordingly, the Court should approve the

---

[19]  The only applicants who did not score at least six percentage points higher on the 2000 examination were Raymond Sisson, Jr., Bradley Schell, Jeffrey Cuzzola and Luis Cruz, Jr. Stipulation 22; see n.15, supra.

[20]  For the same reasons, the evidence would not support the City's objections to awards of monetary relief to Claimants who failed the 2002 written examination (or did not score high enough on the 2002 written examination to be hired in 2002) on the ground that they would not have scored high enough on the examinations used by the City between 1996 and 2000 – i.e., when the Claimants failed the PAT.  However, as established in the United States' Memorandum in Response to Defendant's Motion to Compel, under the Consent Decree, the City cannot object to the United States' determinations regarding monetary relief.

Relief Awards List without amendment.

Respectfully submitted,

SHARON A. SEELEY
CLARE GELLER

Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Employment Litigation Section
950 Pennsylvania Avenue, N.W.
Patrick Henry Building, Room 4908
Washington, D.C.  20530
Telephone: (202) 514-4761

s/Jessica Lieber Smolar
JESSICA LIEBER SMOLAR
Assistant United States Attorney
U.S. Post Office and Courthouse
700 Grant Street, Suite 400
Pittsburgh, PA 15219
Telephone: (412) 894-7419
PA ID No.: 65406