IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,
        Plaintiff

v.                    CIVIL ACTION NO. 04-4 ERIE

CITY OF ERIE, PENNSYLVANIA,
        Defendant


FAIRNESS HEARING



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Monday, November 20, 2006.



APPEARANCES:
        SHARON SEELEY, Esquire, and CLARE GELLER,
        Esquire, U.S. Department of Justice, Civil
        Rights Division, appearing on behalf of
        the Plaintiff.

GERALD J. VILLELLA, Esquire, and KENNETH A. ZAK, Esquire, Assistant City Solicitors, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1          P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 9:04 a.m., on

4  Monday, November 20, 2006, in Courtroom C.)

5

6          THE COURT:  This is the time we set for an

7  individualized fairness hearing on the various proposed awards.

8  But as a preliminary matter, we have an evidentiary issue to

9  take up.  And that involves the information concerning the 2002

10  tests and the earlier tests.

11          THE COURT:  Do you have those with you today, Mr.

12  Villella?

13          MR. VILLELLA:  Yes, we do, your Honor.

14          THE COURT:  Why don't you come on up to the podium.

15   Although we had an opportunity to discuss it on the telephone

16   late Friday afternoon, why don't you indicate, from the City's

17   perspective, how you would propose to use the 2002 tests and

18   what evidentiary value you think it has in separating those

19   individuals who should or should not be considered for some

20   type of relief?

21          MR. VILLELLA:  Well, the tests for each of those

22   three years, 1998, 2000 and 2002, were prepared by the same

23   professional testing service, the International Public

24   Management Association for Human Resources.  We have the test

25   booklets, validation data, study guides and some supporting

3

1   material which would be available for the court's review.  As

2   of this morning, I checked my e-mail, my phone messages, I have

3   not received permission from IPMA to distribute those to the

4   Justice Department, because the Justice Department would not

5   agree to not disseminate them to the candidates or discuss them

6   in open court or in fact to investigate those tests for any

7   potential problems of diversity and results on those tests.  So

8  they felt somewhat concerned about that, they asked me not to

9  disseminate them.

10      THE COURT:  Was it a proprietary concern?

11      MR. VILLELLA:  Mostly a proprietary concern.  And it

12  also became to some extent a defensive concern regarding the

13  Justice Department's representations that hey, your tests

14  themselves may become an issue and who knows, they may start

15  going back and saying you didn't prepare a proper, a valid test

16  which was, that had disparate impact.

17      THE COURT:  Let me just see, aside from and we'll

18  get to the merits of the relevancy in a second.  But you have a

19  bunch of tests with you and supporting and backup information

20  which you cannot give to the Justice Department?

21      MR. VILLELLA:  Right.

22      THE COURT:  Which they do not want made part of the

23  record.  But you want me to look at in-camera and then crank it

24  into my equation as to whether your theory, your theory being

25  that if you flunked the 2002 test, you would have flunked the

4

1  earlier tests, is that right?

2           MR. VILLELLA:  Except the only thing about that is

3   it overcomes, the failure overcomes any presumption in favor of

4   that candidate.  We're not saying for sure he would have

5   failed, but certainly the Title VII presumption in these

6   situations is not so strong as to overcome the need to pass the

7   Civil Service test.  And if the only evidence we have as to you

8   is that you failed in 2002, and we say that the tests are

9   similar enough over the years --

10          THE COURT:  I'm going to hear from the government, I

11   looked at your stipulations, that is the agreed facts.  And

12   this is what I gleaned.  Both parties stipulated to differences

13   between the 2002 and the prior Civil Service exams.  The record

14   reflects, and this is part of the stipulation, that between

15   1996 and 2002, different written exams were used to prevent

16   memorizing the tests.  In 2002 a written exam utilized that was

17   different, at least from what the stipulations appear to

18   indicate, from all previous exams, since the 2002 exam was

19   designed to have no adverse impact on minorities.  In fact, it

20   appears, and this is once again based upon stipulations, that

21   the tests tested completely different subjects with little or

22   no overlap.  The pass rate on each of the written exams, given

23   between 1996 and 2000, was 83 percent or higher.  Whereas, the

24  pass rate on the 2002 exam was 58 percent.  Meaning that the

25  applicants were more than twice as likely to fail the 2002

5

1  exam.  And many of the applicants, or 77 percent who failed the

2  2002 written exam, passed the 2000 written exam.  Now, what am

3  I supposed to make of that and how is it a reasonable

4  inference, based upon what I just told you, that if you happen

5  to have flunked the 2002 exam, it's reasonable to assume and it

6  wouldn't be speculative to assume that you would have flunked

7  any of the earlier exams; it's counter-intuitive, isn't it?

8       MR. VILLELLA:  It's not counter-intuitive, we think

9  it's a fair inference given what we are looking at is our

10  obligation to rebut any presumption in favor of the applicant.

11  I don't think we're required to prove to an absolute certainty

12  or a reasonable certainty that the person would have failed.

13  But if the only evidence we have as to you individually is you

14  came in, had a chance to study for this test and failed.  And

15  the differences between these exams are that there was

16  additional non-cognitive components added in 2002 --

17       THE COURT:  But let me ask you this, numbers are

18   numbers.  77 percent of the applicants who failed the 2002

19   written exam passed the 2000 written exam.  If it had been the

20   other way around, you might be on a horse that was going to get

21   somewhere.  But what does that tell you, almost 80 percent who

22   passed the 2002 or flunked the 2002 exam passed the 2000 exam;

23   now isn't that inconsistent with your theory?

24        MR. VILLELLA:  It's a fairly small number of people

25   we're talking about, how statistically sound that is or to be


6


1   extrapolated is another story.  Plus, also, the issue of how

2   well you would have scored if you did fail in 2002.  You may

3   have passed, but the likelihood that you would have scored well

4   enough to be hired is the other issue which I think is central

5   to whether you get backpay.

6        THE COURT:  Let me now just go back to this question

7   of these documents that you have in front of you.  For the

8   record again, tell me in broad brush what they are, and if I

9   were to look at them, what would I be looking for, what

10  conclusions would you want me to be drawing?

11        MR. VILLELLA:  That the tests are similar enough in

12  overall scope of what they are testing for police purposes,

13  that although they may have somewhat different subject areas

14  and certainly different questions to prevent them from being

15  the same test, that the ability to study and do well on one of

16  these tests is much similar to the others, in that they are not

17  different in order of magnitude or in scope in such a way to

18  say well, this test was much more difficult in 2002.  In fact,

19  the numbers that we're talking about in 2002 were swelled

20  greatly, the number of people who took the test were swelled

21  greatly, as you can see, in that it was permitted to take the

22  test before the physical agility test, which is one factor.

23      And, secondly, that the number of people that were

24  taking the test were swelled by very aggressive recruitment

25  efforts in the community, which produced a lot of minority


7


1  applicants and other applicants that hadn't taken the test

2  before, and may not have had it in their mind to take the test

3  until someone asked them to.

4      THE COURT:  All right, let me hear from the

5  government on this point.

6      MS. SEELEY:  Good morning, your Honor.

7      THE COURT:  Good morning.

8      MR. SEELEY:  Your Honor, I think the court pretty

9   much hit the nail on the head.  The test booklets themselves

10   cannot give the court any basis for concluding anything

11   contrary to what the parties have stipulated to.  And as the

12   court has already essentially summarized those stipulations and

13   what they say, so I won't go over them in detail.  But I do

14   want to point out one thing.  And that is given the court's

15   order of last Friday --

16      THE COURT:  Do you mean the written opinion I sent

17   out to you?

18      MS. SEELEY:  Yes, your Honor.  The City's objection

19   would relate only to the five individuals who actually failed

20   the 2002 exam.  Because the City can only object regarding

21   priority hiring relief.  Now, when Mr. Villella says that we

22   don't know how much better someone might have scored in 2000

23   and 2002 even if they passed, that is totally irrelevant.  That

24   would be relevant only to monetary relief.  The question is

25   does the fact that they failed in 2002 mean that they would

1  have failed in earlier exams.

2          THE COURT:  For priority hiring purposes?

3          MS. SEELEY:  Exactly.  They only had to qualify,

4  your Honor, that's what the Consent Decree says.

5          THE COURT:  You had filed, let me just clear this up

6  as a record keeping matter.  The government filed a motion,

7  plaintiff's unopposed motion to substitute corrected Relief

8  Awards List.  And as I understand it, what that really involved

9  was the addition of one person, is that right?

10          MS. SEELEY:  Your Honor, we had actually filed the

11  written motion to take one person off, she's actually been

12  counted twice.  And this morning I gave to your law clerk a

13  corrected version that adds a new person on at the end, Judith

14  Garcia.  Because she had timely, based on a postmark, returned

15  her Interest in Relief form, due to some error in the

16  processing of the mail at the Department of Justice, we only

17  got hers last week and determined that she is eligible for

18  monetary relief.  So the bottom line would be that since we had

19  taken one off and now put one back on, the amount of monetary

20  relief for each eligible claimant is the same as it was on the

21  original Relief Awards List.  So it's the same amount as what

22  we gave notice to the claimants.

23          THE COURT:  $3,288?

24          MS. SEELEY:  Yes, your Honor.

25          THE COURT:  With the exception of Ms. Frey, whose

9

1   award is greater?

2           MS. SEELEY:  Right.

3           THE COURT:  Is there anything else you want to tell

4   me on the evidentiary issue?

5           MS. SEELEY:  No, your Honor.

6           THE COURT:  Let me make a quick ruling on that.

7   Mr. Villella, I'm going to construe your effort to introduce

8   this as a motion -- not to put words in your mouth, but

9   essentially what it is, it's a motion for introduction of test

10  material -- you can characterize it in some other way if you

11  want?

12          MR. VILLELLA:  I'll make it actually clear, what it

13  is, is an effort to comply with the response to our objections

14  that the government filed saying hey, you didn't produce those

15  test booklets themselves when you filed your objections.  We

16  did not believe that those were absolutely essential to make

17  the point we were making as to those objections -- given that

18  the lists of passed and failed were supplied.  But in order not

19  to be non-responsive, we said fine, we'll see if we can get

20  test booklets.  And after great difficulty, we were able to get

21  them.

22          THE COURT:  Before you sit down, let me ask you one

23  other question.  Assuming for the sake of my question that the

24  test booklets would in some sense have some marginal relevance.

25  Wouldn't I have to be an expert in order to look at those


10


1  documents and draw any meaningful conclusions as to whether one

2  test would more likely than not produce a similar score with

3  the same individual on another.  That's way beyond my ability

4  to do, I'm not in the business of preparing standardized tests.

5  You would need an expert for that, wouldn't you?

6          MR. VILLELLA:  Only if the question was, as to each

7  individual, if we had to prove through a preponderance of the

8  evidence that that person would have passed or what their score

9   would have been, what their range of score likely would have

10  been.  We don't believe that we have to do that, we simply have

11  to rebut the presumption, which we don't think extends as far

12  as the government has contended that it extends.  We say if

13  there's a presumption that they were qualified simply because

14  they failed the physical test, we're saying this superior and

15  primary selection device, you have to pass that and do well on

16  it in order to get backpay relief.  We feel our obligation to

17  rebut that presumption is not that difficult to meet and is

18  essentially met by showing that you failed the most recent test

19  that you took.

20        THE COURT:  All right.  In order to tee this up,

21  though, maybe the way to do it is, I guess functionally you're

22  making a motion in limine, is that right?

23        MS. SEELEY:  Yes, your Honor.

24        THE COURT:  All right, then that's how I'm going to

25  treat it.  This is an order.


                              11


1                   ORDER

2             Presently pending before the court is a motion in

3  limine filed by the United States objecting to, first, the

4  relevance of various test materials.  Specifically, the 2002

5  tests -- I gather, there's some copy of earlier tests, is that

6  right as well, Mr. Villella?

7       MR. VILLELLA:  Yes.

8       THE COURT:  And supporting documentation.  In

9  essence, it is the City's position that any claimant who failed

10  the 2002 written examination or who scored too low to be hired

11  in that year, should also be disqualified from any relief award

12  relative to a prior year in which the claimant may have failed

13  the PAT.  The City argues that the award determinations are

14  objectionable unless the United States demonstrates that there

15  is some affirmative basis from which to assume the claimant

16  would have been hired by the City.

17       I find, as I said earlier, that there is no

18  reasonable inference to be drawn from a claimant's failure on

19  the 2002 written exam, insofar as it relates to the claimant's

20  application for hire in a prior year.  I note that the Consent

21  Decree requires the City to prove by a preponderance of the

22  evidence that the claimant to whom the City objects was not

23  qualified at the time they failed the PAT, not at the time they

24  failed the 2002 written exam.  I also note, as I indicated

25  earlier on the record, that the parties entered into a rather

12

1  extensive stipulation as to differences between the 2002 and

2  the prior Civil Service exams.  And I reiterate those

3  differences now:

4       (A)  Between 1996 and 2002, different written

5       Exams were intentionally used to prevent memorizing

6       the test.

7       (B)  In 2002 they used a written exam that was

8       different from all previous exams since the 2002

9       exam was designed to have no adverse impact on

10       minorities.  In fact, they tested completely

11       different subjects with little direct overlap.  See

12       paragraphs 12, 13, 47 and 52 of stipulation.

13       (C)  The pass rate on each of the written exams that

14       was given between 1996 and 2000, equalled 83 percent

15       or higher.  (The female pass rate was 89 percent.)

16       Whereas, the pass rate on the 2002 exam was only 58

17       percent.  Meaning that applicants statistically were

18       more than twice as like likely to have failed the

19    2002 exam.

20    (D)  Many, approximately 77 percent or 14 of 18

21    applicants who failed the 2002 written exam, in fact

22    passed the 2000 written exam.

23    Given the stipulations, given the difference in pass

24  rates, I find that it is not a reasonable inference that if a

25  claimant failed the 2002 written exam, they would in fact have

13

1  failed the earlier exams.  Also, with respect to the proposed

2  written information, that is the 2002, copy of the 2002 exam,

3  supporting documentation and copies of the earlier exams and

4  supporting documentation, the City would have me review that

5  material in an attempt to reach a conclusion as to -- let me

6  say that again.  The City would have me review that material

7  allegedly for the proposition that a review would reasonably

8  suggest that the tests were sufficiently similar so that a

9  reasonable inference could be drawn that if one were to have

10  failed the 2002 exam, it was more likely than not that one

11  would have failed any of the earlier exams.

12    First, for the reasons previously set forth on the

13    record, the stipulations that have been entered into already

14    between the parties, demonstrate that such an inference would

15    be entirely speculative and not reasonable.

16            Second, even if the court were inclined to review

17    the material, I would be the wrong person to be doing it

18    because, in my view, it would require expert testimony and

19    analysis.  The court is not in the business of manufacturing or

20    preparing standardized tests, that is a whole different area of

21    academia, it would be independently admissible on that basis.

22            So for all those reasons, the motion in limine by

23    the United States is granted.

24            All right, now we're ready to go off on to the

25    individual claimants.  I have no particular preference in the


                                    14


1    order, in the manner in which we do this.  I guess the first

2    thing would be to determine -- do we have a claimant that is

3    here today who would like to come up and indicate what her

4    objections are?

5            MS. SEELEY:  Your Honor, the only claimant who is

6    here today is Judith Garcia, who was the person that was added

7  on the corrected list.

8      THE COURT:  All right.  And I gather -- is that Ms.

9  Garcia?

10     MS. SEELEY:  Yes.  Your Honor, Ms. Garcia has

11  indicated that she doesn't want to speak to the court, she just

12  wanted to listen.

13     THE COURT:  She can do that.  Then the three

14  individual objectors were Zabrina Thompson, Trelane Battles

15  Sherrod and Fatima Gibbs.  I gather, then, since they're not

16  here, I'm simply taking their objections up on paper, is that

17  right?

18     MS. SEELEY:  Right, your Honor.

19     THE COURT:  All right, Mr. Villella, I guess in a

20  manner of speaking the ball is back in your court here, what do

21  you want to tell me?

22     MR. VILLELLA:  At this point, your Honor, the ruling

23  that you previously made, as well as the rulings you made

24  today, of course, moots nearly all of the issues that were

25  involved in this.  And I suppose the people who failed in the

15

file:///A|/ERIE1120.TXT

1    most recent examination are to receive financial awards, as

2    well as priority hires.  It doesn't change our overall

3    obligation monetarily or on priority hire list.  We simply felt

4    we had to make those objections in the Consent Decree and the

5    law under Title VII provided for that and our obligation to

6    protect the City's interests, to maintain the integrity of that

7    entire system, compelled us to make these objections.

8    Therefore, however the money is distributed at this point, if

9    at all it is to be distributed, we maintain a resistance to the

10   idea that people who demonstrate a failure, should be given

11   backpay awards, which reflect the idea --

12        THE COURT:  Could I ask you another question.

13        MR. VILLELLA:  Yes.

14        THE COURT:  And this is getting back to your point,

15   your concern that if someone would have failed the 2002 exam,

16   they would have failed an earlier exam.  But in terms of --

17   it's not as though that any of those individuals would have an

18   unopposed ride into being hired because it's true, at the end

19   of the day, that whoever those people were would still have to

20   pass whatever test the City has in place.  So your point

21   couldn't be, was it, that the City might get "stuck" with

22  unqualified people because you would have a test at the end of

23  the day that's still in place that would not be able to winnow

24  those people out, the qualified from the unqualified, isn't

25  that right?


16


1        MR. VILLELLA:  That's correct.  That's the essence

2  of the Consent Decree, which we what we participated in.  I

3  would say that going back to the beginning of this controversy

4  before the lawsuit and the old administration, we were always

5  willing in principle to create a priority hire list.  We were

6  resistant all along to the idea of monetary awards unless

7  people could actually demonstrate a likelihood of having been

8  hired, because that's Title VII's essential purpose.  So that I

9  guess that's the beginning and finally the Alpha Omega on where

10  the City stood on this.

11        THE COURT:  All right.  Well, all that having been

12  said, then, are you telling me that based upon -- what was the

13  date of that ruling when I issued that 12 or 13 page opinion?

14        MS. SEELEY:  November 17th.

15        THE COURT:  Based upon, so I'm clear, then, based

16  upon my ruling of November 17th and my most recent ruling on

17  the lack of relevance of the proposed material that you wanted

18  to introduce here, does the City have, by way of testimony,

19  documents or any other method, does the City have any other

20  proof to come forward with, because you do have the burden of

21  proof, to demonstrate that the priority hiring that has been

22  proposed by the United States is unjust or inequitable within

23  the meaning of the Consent Decree?

24      MR. VILLELLA:  Well, we think we've submitted about

25  all we can to show that few if any people showed that they have


17


1  the lawful objective hiring criteria or had it at the time of

2  the failure of the physical agility test.  But understanding

3  the way the court, the nature of the court's ruling last week,

4  as well as in court here today, makes our objections unlikely

5  to succeed on possibly any of the candidates.  We do maintain

6  that the inference drawn from someone's failure in 2002 cannot

7  be extrapolated to say they would have scored well enough --

8  the likelihood of being hired, especially for monetary relief.

9  But we understand that the ultimate ruling on the matter has

10    been made.

11          THE COURT:  All right.  You can take a seat.  Does

12    the government have anything it wants to say?

13          MS. SEELEY:  I don't have anything to add to what's

14    in our written briefing, your Honor.

15          THE COURT:  All right, I'm going to take a short

16    break, then I'm going to come out and put an order on the

17    record on all these individual reliefs.

18          (Recess from 9:30 a.m.; until 9:38 a.m.)

19          THE COURT:  All right, this is going to be an order.

20                      ORDER

21          This hearing arises as the product of a Consent

22    Decree, the terms of which were negotiated by the parties and

23    approved by this court on June 15, 2006.  This lawsuit was

24    brought by the United States under Section 707 of Title VII of

25    the Civil Rights Act of 1964, (Title VII), 42 U.S.C. Section


18


1    2000e-6 against the City of Erie in connection with the City's

2    use of a physical agility test (PAT) to screen applicants for

3    employment as entry-level police officers during the years 1996

4    through 2002.  The United States successfully prosecuted the

5    liability portion of this case and obtained a liability

6    judgment against the City on December 13, 2005.

7            Prior to engaging in relief-phase discovery, the

8    parties negotiated terms of a settlement as memorialized in the

9    Consent Decree.  On June 15, 2006, following a fairness

10   hearing, I found the proposed settlement to be fair, adequate,

11   reasonable, lawful, and consistent with public interest and I

12   therefore entered the Consent Decree with minor modifications.

13           Among other things, the Consent Decree calls for the

14   creation of a $170,000 Settlement Fund to be distributed among

15   eligible claimants using a "shortfall/pro-rata" damages model.

16   With this method of calculating damages, a statistical

17   calculation is made as to the "shortfall," meaning the number

18   of job positions denied to female applicants as a result of the

19   City's discriminatory conduct.  Once the shortfall is

20   determined, the amount of wages those workers would presumably

21   have earned, less mitigation, is calculated and the total fund

22   is then distributed on a pro-rata basis among the claimants.

23   See EEOC_v._Chicago_Miniature_Lamp_Works, 640 F.Supp. 1291,

24   1298 (N.D. Ill. 1986).  See also United_States_v._State_of_New

file:///A|/ERIE1120.TXT

25  Jersey, 1995 WL 1943013 at page 5 (D.N.J. Mar. 14, 1995).

_____

19

1  In this case, the parties arrived at a compromise agreement

2  that there was a shortfall of five entry-level police officer

3  jobs that otherwise would have gone to female applicants but

4  for the PAT.  The parties further agreed that, to account for

5  the five shortfall job positions, a total Settlement Fund of

6  $170,000 was appropriate.  The City is to provide the total of

7  $170,000 sum over a period of four years, making annual

8  payments in the amount of 1/4 of the total settlement sum.

9  Because of the impracticability of pinpointing which claimants

10  would have been hired in the absence of the PAT, the Consent

11  Decree allows all eligible claimants to receive a pro-rata

12  share of the Settlement Fund.

13        Based upon this same presumed hiring shortfall, the

14  Consent Decree provides that the City will hire as many as five

15  qualified claimants for the police officer position, subject to

16  various conditions and limitations enumerated in the Decree.

17  One noteworthy condition is that the City is under no

18  obligation to offer to re-hire any claimant on the priority

19  re-hire list who is found to be unqualified for the entry-level

20  police officer job using the lawful, objective hiring criteria

21  in use by the City at the time the claimant is evaluated.

22      The Consent Decree sets forth in some detail the

23  procedure by which the foregoing relief is to be administered.

24  Consistent with those procedures, following my entry of the

25  Consent Decree on June 15, the City was required to send to


20


1  each claimant a notice of the process for filing a claim for

2  relief under the Decree and an Interest in Relief form.  (See

3  Paragraph 47.)  Claimants were then required to submit their

4  Interest in Relief forms to the United States in a timely

5  manner as a prerequisite to being considered for individual

6  remedial relief under the Decree.  (Paragraph 48.)

7      The United States received Interest in Relief forms

8  from 57 claimants.  Each of the individuals who returned an

9  Interest in Relief form is listed on the plaintiff's "Relief

10  Awards List," as corrected on November 3, 2006.  Of all the

11  claimants who returned Interest in Relief forms, only one

12  individual, Jennifer Mazur, submitted a form in an untimely

13  manner and without due cause.  Another claimant, Amanda

14  Ponting, indicated on her form that she is not interested in

15  receiving any form of relief.

16        The United States sent a brief questionnaire to each

17  of the claimants who returned an Interest in Relief form

18  indicating that she is interested in relief.  All but three of

19  these claimants (Shannon Brophy, Denise Osterberg and Mary Ann

20  Santiago) returned a completed questionnaire.  Based on the

21  information provided by the claimants in response to the

22  questionnaire, information previously provided by the City, and

23  follow-up telephone interviews of some claimants, the United

24  States made its relief determinations as reflected on its

25  amended Relief Awards List.  Specifically, that the United


21


1  States has determined that 46 claimants are entitled to

2  monetary awards and, of that group, 14 are also eligible for

3  priority hire relief.

4        The United States filed its Relief Awards List on

5  September 8, 2006, and subsequently amended the list, in minor

6  part, on November 7, 2006, and again today by adding Judith

7  Garcia.  Pursuant to paragraph 49 of the Consent Decree, the

8  United States, upon filing its Relief Awards List, was required

9  to simultaneously serve upon the City a copy of the Relief

10  Awards List, as well as copies of the Interest in Relief forms

11  which were received from the claimants.  In addition, under

12  paragraph 51 of the Consent Decree, the United States was

13  required to notify each claimant of its determination regarding

14  the claimant's eligibility for relief, the reason or reasons

15  for any determination of ineligibility, and the amount of the

16  claimant's monetary award.  The United States was also required

17  to give claimants notice of the date, time and purpose of this

18  hearing, as well as instructions for filing an objection to its

19  relief determination.  It appears that the parties have

20  complied with all of the notice requirements under the Consent

21  Decree.

22          Three claimants, Zabrina Thompson, Trelane Battles

23  Sherrod and Fatima Gibbs, have filed objections to the United

24  States' relief award determinations.  In addition, the City has

25  raised a number of objections.  We will address these

22

1   objections in more detail below, but preliminarily, I will

2   review the method utilized by the United States in making its

3   awards determinations.

4        As I noted above, 57 claimants returned Interest in

5   Relief forms to the United States.  One claimant, Jennifer

6   Mazur, returned her Interest in Relief form in an untimely

7   manner.  Because the United States has determined that she did

8   no have good cause for submitting her form late, Ms. Mazur was

9   deemed ineligible for relief.  Another claimant, Amanda

10  Ponting, returned a timely form, but indicated she was not

11  interested in relief.  Therefore, no relief is being proposed

12  for Ms. Ponting.

13        With respect to the remaining 55 claimants, who

14  submitted timely forms and sought relief, there were two

15  circumstances under with the United States determined that no

16  award of relief was warranted:  (1) if the United States

17  considered it "certain" that the claimant would not have been

18  hired even in the event she had passed the PAT; and (2) if,

19  based on information known to the United States (such as

20  claimant's subsequent criminal history), the United States

21  would not have sought relief for the claimant during the relief

22  phase of the case.

23        Applying these guidelines, the United States

24  determined that 46 individuals were eligible for monetary

25  relief.  As to one particular claimant, Cheryl Frey, the United

23

1  States determined that an award of $22,035 was appropriate.

2  Ms. Frey applied for a police officer position in 2002, the

3  only year in which the written Civil Service exam was

4  administered prior to the PAT.  After administering both the

5  written and physical agility tests, the City rank-ordered its

6  eligibility list in descending order of the candidates' written

7  exam scores, allowing for veterans' points in accordance with

8  state law.  Thus, for 2002 alone, the United States was able to

9  determine, based on the written exam scores, whether a claimant

10  would have been reached on the eligibility list in the event

11  she had passed the PAT.  Among the 2002 applicants, Ms. Frey

12  alone received a written exam score which, after accounting for

13  veterans' points, was higher than that of Thomas Lenox, the

14  lowest-scoring candidate hired from the 2002 eligibility list.

15  None of the other claimants who failed the PAT in 2002 scored

16  high enough on the written exam to have been hired because all

17  of them ranked below Mr. Lenox based on their written exam

18  scores.

19       Based on these facts, together with Ms. Frey's

20  cleaning driving record and lack of criminal history, the

21  United States asserts "there is every reason to believe that

22  Ms. Frey would have been hired has she passed the PAT."  See

23  Plantiff's Response to Objections, Document 173.  The United

24  States therefore determined that Ms. Frey should receive a

25  larger share of the monetary relief than the other claimants

24

1  who failed the PAT between 1996 and 2000.  More specifically,

2  the United States determined that Ms. Frey should receive the

3  estimated value of one of the shortfall positions.  In arriving

4  at this estimation, the United States assumed:  (1) that an

5  unsuccessful candidate would obtain a comparable job in six

6  months time, thereby mitigating her damages; (2) that the value

7  of overtime and benefits in the interim would amount to 50

8  percent of salary; (3) that the starting salary for an

9  entry-level police officer in 2002 was $24,000; and (4) that a

10  multiplier of 1.2242 should be applied to account for interest

11  since 2002.  The resulting figure, $22,035, is the amount of

12  monetary relief which the United States intends to award Ms.

13  Frey.

14          As to the remainder of the 45 claimants for whom the

15  United States determined that monetary relief was appropriate,

16  a pro-rata distribution of the Settlement Fund is proposed.

17  Thus, once the $22,035 award for Ms. Frey is backed out of the

18  total fund, the remainder ($147,965) would be split evenly

19  among the 45 claimants, resulting in an award of $3,288 for

20  each individual.  In endorsing this approach, the United States

21  notes that each of the remaining 45 eligible claimants failed

22  the PAT in a year other than 2002.  In years prior to 2002, the

23  City did not allow applicants to take the written Civil Service

24  exam even if they failed the PAT.  Thus, the United States

25  reasons, there is no information from which it can determine


                              25


1   that any of the claimants who failed the PAT between 1996 and

2   2000 would not have been hired based on her written exam score.

3   Accordingly, the United States determined that each of the 45

4   eligible claimants (other than Ms. Frey) should receive a

5   pro-rata share of the remaining settlement proceeds.

6           With regard to priority hiring, there were 22

7   claimants who initially sought relief.  The United States found

8   that priority hiring relief was appropriate for 14 individuals.

9   Claimants were deemed ineligible for either of the two reasons

10  previously mentioned, if it was "certain" that the claimant

11  would not have been hired, or if the United States would not

12  have sought relief for the claimant during the relief phase.

13  Given Ms. Frey's unique status among those claimants who failed

14  the 2002 PAT, the United States determined that she was the

15  only 2002 applicant who was entitled to priority hiring relief.

16  By the same token, however, as to any claimant who failed the

17  2002 PAT and also failed the PAT in an earlier year between

18  1996 and 2000, the United States did not consider the

19  claimant's performance on the 2002 written Civil Service exam

20  to be dispositive of her relief request relative to the earlier

21  year.  As this last point has been the source of an objection

22  by the City of Erie, I took it up in some detail at the hearing

23  today and previously ruled on it.

24          First, before I continue, I should say a few words

25  on the relevant standard governing my review of these


26


1  proceedings.

2      The standards to be applied in considering

3  objections to the United States' relief determinations are set

4  forth in Sections VII and VIII of the Consent Decree.

5  Paragraph 49 of the Decree anticipates that the United States

6  will make the relief award determinations in the first

7  instance.

8      With respect to monetary awards, the Decree puts no

9  conditions on those determinations other than the requirement

10  that the determinations be "reasonable and equitable in

11  relation to the claimant population and the total amount of the

12  Settlement Fund and consistent with the provisions of the

13  Decree."  Paragraph 49.

14      The court shall approve the Plaintiff's Relief

15  Awards List as submitted except to the extent that the court

16  may find any objections "well-founded."  As to the amount of

17  monetary relief to be awarded, Paragraph 55 of the Decree

18  states that:

19          "The court shall find any objection regarding the

20          amount of monetary relief to be awarded to a

21          claimant is well-founded only if the amount is not

22          reasonable and equitable in relation to the claimant

23          population and the total amount of the Settlment

24          Fund."

25          With regard to the plaintiff's priority hiring


27


1   relief determinations, Paragraph 55 of the Consent Decree

2   provides:

3          "The court shall find any objection, including any

4          objection made by the City, regarding a claimant's

5          eligibility for consideration for priority hire is

6          well-founded only if the objector, objectors prove

7          by a preponderance of the evidence that, at the time

8          she failed the PAT, the claimant was not qualified

9          for the position of entry-level police officer in

10         the City's Bureau of Police using the lawful,

11         objective hiring criteria in use by the City at that

12         time."  Consent Decree, Paragraph 55.

13         Therefore, the City, or any other objector bears the

14   burden of proving by a preponderance of the evidence that the

15   claimants that it asserts are ineligible for priority hiring

16   relief were not qualified at the time that each failed the PAT.

17         I now turn to the objections.

18         Zabrina Thompson failed the PAT in 2000.  She

19   requested monetary and priority hiring relief and the United

20   States has determined that she is eligible for both; the

21   monetary award being $3,362 pro-rata share in the Settlement

22   Fund.

23         Ms. Thompson apparently objects to the amount of her

24   monetary award and she appears to be operating under the belief

25   that her current criminal history and driving record were


                              28


1   considered in determining the amount of her relief.  She points

2   out that she has no criminal record and only parking tickets.

3   To the extent that Ms. Thompson believes that criminal history

4   or driving record were used to calculate her award, she is

5   mistaken and her objection lacks any foundation.  As discussed

6   above, information as to criminal history or driving record was

7   considered only to the extent it rendered some claimants

8   ineligible for relief; but that was not the case for Ms.

9   Thompson.  The amount of her relief, as discussed, is based on

10  a pure, pro-rata calculation of available funds.

11          To the extent Ms. Thompson objects to other

12  claimants receiving a higher monetary award, the only claimant

13  receiving a higher award, as I have discussed, is Cheryl Frey.

14  I find that the amount of monetary relief allocated to Ms. Frey

15  is reasonable and equitable because of the virtual certainty

16  that had Ms. Frey passed the PAT, she would have been hired

17  from the 2002 eligibility list.  In my earlier order of June

18  15, 2006, wherein I approved the terms of the Consent Decree,

19  I found that an equal distribution of the funds among eligible

20  claimants is fair, given the impracticability of determining

21  which of the other claimants would have been hired.  As the

22  United States points out, almost all of the claimants had clean

23  criminal and driving records and, therefore, there is no

24  particular basis upon which to distinguish Ms. Thompson's claim

25  from that of other eligible claimants.  Overall, I find her

29

1  monetary award to be fair, reasonable, and equitable in light

2  of the claimant population and the total amount of the

3  Settlement Fund.

4           Trelane Battles Sherrod expressed interest only in

5  monetary relief and the United States determined that she

6  should receive no award.  Ms. Sherrod applied for a police

7  officer position only in the year 2002.  The United States

8  determined that she should not receive a monetary award because

9  Ms. Sherrod's score on the 2002 written Civil Service exam was

10  lower than that of the lowest-scoring applicant hired from the

11  2002 eligibility list.  Ms. Sherrod nevertheless believes that

12  she could have been hired from the 2002 eligibility list if the

13  City had been financially able to hire more police officers

14  from that list.  She further maintains that if veterans' points

15  were not awarded and if applicants were ranked on written test

16  scores alone, she could have been hired from the 2002 list.

17           I find these objections are not well-founded.  It

18  appears to be undisputed that Ms. Sherrod's score on the 2002

19  written exam was 82, while the last person hired, Thomas Lenox,

20  scored 84, veterans' points included.  The United States

21  reasonably and correctly determined that Ms. Sherrod's failure

22  on the 2002 PAT was not the reason for her failure to be hired.

23  Even if she would have passed the PAT, she would not have been

24  reached on the eligibility list given her score.  To the extent

25  that the City's financial condition placed limits on the number

30

1  of police officers that could be hired, this unfortunate fact

2  does not entitle Ms. Sherrod to a monetary award.  Similarly,

3  the fact that others were placed ahead of her on the

4  eligibility list because of veterans' points, which is a state

5  mandated requirement, does not render her entitled to relief.

6  As I noted at the previous fairness hearing, it is the PAT and

7  only the PAT, which this court found to have an unlawful

8  discriminatory impact against females and, therefore, Ms.

9  Sherrod is not entitled to relief to the extent other factors

10  besides the PAT were responsible for her not being hired.  I

11  find the United States' determination in this regard to be

12  reasonable and consistent with the provisions of the Consent

13  Decree.

14          I now turn to Fatima Gibbs.  Fatima Gibbs failed the

15  PAT in 2000 and has expressed an interest only in monetary

16  relief.  The United States determined that she should receive a

17   $3,288 pro-rata share in the Settlement Fund.  Ms. Gibbs

18   objects to this amount and believes her award should be greater

19   because, according to Ms. Gibbs:  (1) the City intentionally

20   made her fail the PAT in 2000; and (2) she filed a claim with

21   the Pennsylvania Human Relations Commission, kept in contact

22   with the Commission, and followed the case for over five years,

23   and has incurred some undesirable publicity in connection with

24   this litigation.  In addition, Ms. Gibbs believes that the

25   United States' determination to award more money to Cheryl Frey

31

1   is premised upon Ms. Frey's education.

2        I find these objections to be meritless.  To begin,

3   this is a case involving a theory of disparate impact

4   discrimination, not intentional discrimination by the City of

5   Erie.  The United States correctly points out that it has not

6   alleged, and I have never ruled, that the City of Erie

7   intentionally discriminated against females in utilizing the

8   PAT.  Accordingly, Ms. Gibbs' monetary award in this matter is

9   not supported by, or reflective of, any finding of intentional

10   discrimination.  Moreover, her allegation has not been proved

11  as a factual matter in this litigation.  Even if her allegation

12  is true, it does not warrant a greater monetary award in this

13  disparate impact discrimination case.

14          Second, this is a pattern or practice lawsuit

15  brought by the United States under the Civil Rights Act.  This

16  lawsuit was not based on a charge of discrimination filed by

17  Ms. Gibbs or any other individual.  In that regard, this

18  lawsuit is to be distinguished from cases brought under Section

19  706 of Title VII, which are based on a charge of discrimination

20  filed with the EEOC and referred to the Department of Justice.

21  The United States does not believe that Ms. Gibbs' PHRC claim

22  and on-going interest in the lawsuit justify giving her a

23  higher monetary award.  In this regard, I find the United

24  States' position is reasonable.  As I noted during the June

25  15th fairness hearing, the United States "must seek to obtain

32

1  justice for as many victims as possible" in light of its scarce

2  resources.  Not every claimant can be made completely whole in

3  this litigation.  Moreover, while Ms. Gibbs may have been

4  subjected to unfortunate publicity, rumors, and the like as a

5   result of this litigation, those are not the types of injuries

6   which this monetary award is designed to redress.  Rather, the

7   monetary relief represents an award of backpay, less

8   mitigation, benefits and interest, not compensation for

9   inconvenience, or general pain and suffering.

10        Finally, Ms. Gibbs is mistaken to the extent that

11   she believes that the proposed award for Cheryl Frey is based

12   upon Ms. Frey's education.  Rather, Ms. Frey's award is based

13   not upon her education, but upon her performance on the 2002

14   written exam.  Because Ms. Gibbs failed the PAT in 2000 and was

15   not permitted to take the written exam, the United States lacks

16   the degree of certitude with regard to Ms. Gibbs' chances for

17   hire as it has relative to Ms. Frey.  For all the foregoing

18   reasons, then, I find that Ms. Gibbs' objections are not

19   well-founded, and I find that the United States' monetary

20   relief determinations to be reasonable and equitable in

21   relation to the claimant population and the total amount of the

22   Settlement Fund.

23        Now, turning briefly to the City of Erie's

24   objections.  Preliminarily, I note that the City previously

25   filed a motion to compel discovery, wherein it took the

33

1   position, among other things, that (1) the United States bears

2   the burden of proving, as to any claimant obtaining relief,

3   that the claimant should have been hired by the City but for

4   her failure on the PAT; (2) that a number of monetary relief

5   determinations are objectionable; and (3) that as to any

6   monetary award determination that is successfully challenged in

7   these proceedings, the settlement funds in question must revert

8   back to the City, as opposed to being redistributed among the

9   eligible claimants.  On November 17, 2006, I rendered a ruling

10  on the motion to compel and put those issues to rest.

11  Specifically, I ruled that under the terms of the Consent

12  Decree which govern these proceedings, the burden of proof is

13  not on the United States to prove that any particular claimant

14  would have been hired in the absence of the PAT, but is rather

15  on the City to prove by a preponderance of the evidence, that

16  as to any claimant seeking priority hire relief, the claimant

17  in question would not have been hired by the City for reasons

18  apart from her performance on the PAT.  I further ruled that,

19  under the terms of the Consent Decree, the City is not

20  permitted to raise objections to the United States' monetary

21  relief determinations, but is permitted to object only to

22  priority hire determinations.  In addition, I ruled that, to

23  the extent any of the United States' monetary relief

24  determinations would be overruled by me, those funds do not

25  revert back to the City under the terms of the Consent Decree,


34


1  but rather would be redistributed among all eligible claimants

2  other than Ms. Frey.  Rather than restate at this time my

3  reasons for those rulings, for present purposes I will simply

4  incorporate by reference the rulings in my November 17th order

5  on the motion to compel.

6       That having been said, I note that the City has

7  objected in broad brush to an award for any claimant as to whom

8  the record shows that the claimant (1) failed the 2002 Civil

9  Service exam; or (2) took the 2002 Civil Service exam and

10  ranked below anyone hired from the 2002 list.  The City also

11  objects to any claimant as to whom there is no record evidence

12  that the claimant ever passed a Civil Service exam or its

13  equivalent.

14          Primarily, the City's objections relate to claimants

15    who applied in 2002.  The City asserts that if all men and

16    women who failed the 2002 PAT are added back on to the list,

17    then Cheryl Frey could never have been hired because at least

18    nine men and one female who failed the PAT, would have ranked

19    above her on the 2002 eligibility list.  The one female who

20    scored higher than Cheryl Frey is Jolene Martin.  According to

21    the City, Ms. Martin alone scored high enough to have been

22    hired, but did not request relief.  Thus, the City reasons,

23    Ms. Frey is not entitled to the monetary award determination

24    that the United States has proffered.  The City goes on to

25    suggest, however, that it does not oppose Ms. Frey obtaining


35


1    priority hire relief.

2          The short answer to this is that, as I previously

3    ruled, the City lacks standing under the Decree to challenge

4    monetary awards.  Therefore, if the City does not object to the

5    hiring relief portion of Ms. Frey's award, the debate ends

6    there.

7          Nevertheless, even if I take the City's arguments on

8    its merits, the objection to the monetary award fails.  The

9    City's argument is premised on the assumption that all males

10   who failed the PAT in 2002 should be added back into the

11   calculus.  That reasoning is invalid in light of my ruling that

12   the PAT discriminated unfairly against women.  There is no

13   finding that it was an unfair test as to men.  Thus, in

14   attempting to calculate the likely effect on female hires

15   absent the PAT, it is not proper to factor into the mix men who

16   failed the PAT.  There is no inference to be drawn in this case

17   that the men who failed the PAT would have otherwise passed a

18   non-discriminatory agility test.

19          As I indicated earlier on the record, the City also

20   argues that any claimant who failed the 2002 written

21   examination or who scored too low to be hired in that year

22   should also be disqualified from any relief award relative to a

23   prior year in which the claimant failed the PAT.  For the

24   reasons previously put on the record in conjunction with my

25   ruling on the motion in limine, I reject that proposition and I

36

1    simply incorporate by reference my previous rulings.

2          For the foregoing reasons, then, any objections

3   filed to the proposed relief awards are overruled.

4          Are there any other loose ends I have to tie up,

5   from the government's perspective?

6          MS. SEELEY:  No, your Honor.

7          THE COURT:  How about from the City's perspective?

8          MR. VILLELLA:  Is the actual amount back to $3,288

9   because of the one coming in --

10         THE COURT:  It is.  All right, then at this point,

11   after several years, I'm going to direct that the Clerk mark

12   this case closed.  All right, we're done.

13

14         (Whereupon, at 10:11 a.m., the proceedings were

15   concluded.)

16

17                    - - -

18

19

20

21

22

23

24

25

37

1               C E R T I F I C A T E

               – – – – – – – – – –

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12   _____

13   Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25